Booth, Chief Justice,
delivered the opinion of the court:
This case is before the court under the terms of the following special jurisdictional act (41 Stat. 585) :
“ Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled. That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment on principles of justice and equity and as upon a full and fair arbitration of the claims of the Iowa Tribe of Indians, of Oklahoma, against the United States, with the right of appeal by either party to the Supreme Court of the United States, for the determination of the amount, if any, which may be *603 legally or equitably due said tribe of Indians under' any treaties or laws of Congress or under any stipulations or agreements, whether written or oral, entered into between said tribe of Indians and the United States or its authorized representatives, or for the failure of the United States to pay any money which may be legally or equitably due said tribe of Indians: Provided, That the court shall also consider and determine any legal or equitable defenses, set-offs, or counterclaims which the United States may have against the said Iowa Tribe of Indians. A petition in behalf of said Indians shall be-filed in the Court of Claims within one year after the passage of this act, and the Iowa Tribe of Indians shall be the party plaintiff and the United States the party defendant, and the petition may be verified by the attorney employed by the said Iowa Tribe of Indians to prosecute their claim under this act, under contract to be approved by the Commissioner of Indian Affairs and the Secretary of the Interior, as provided by law, upon information and belief as to the facts alleged in said petition. Upon the final determination of the cause the Court of Claims shall decree such fees and expenses as the court shall find to be reasonably due to be paid to the attorney or attorneys employed by said Iowa Tribe of Indians, and the same shall be paid out of any sum or sums of money found due said Iowa Tribe of Indians: Provided} That in no case shall the fees and expenses decreed by said court be in excess of 10 per centum of the amount of the judgment.”
The petition filed upon behalf of the Iowa Indians alleges a number of causes of action, finally in the briefs and contentions of counsel reduced to three, the report of the Comptroller General disclosing a complete defense to all the items insisted upon except the three mentioned.
The Iowa Indians occupied, under an Executive order of the President dated August 15, 1883, a specifically described reservation in the then Territory of Oklahoma. The tribe had emigrated from Nebraska and Kansas and the reservation in Oklahoma was occupied in common. On May 20, 1890, the Jerome or Cherokee Commission, acting under the authority conferred by section 14 of the act of March 2, 1889, entered upon negotiations with the Indians, the purpose, being to allot the tribal lands in severalty among the Indians and procure the surplus for the Government. The commission went upon the reservation and established personal contact with the Indians, and finally con *604 summated an agreement wherein it was provided that each member of the tribe was to receive eighty acres of land in severalty, with no undue restrictions as to location. A stipulated reservation of acreage was made for religious and educational purposes, and especial provision was made for William Tohee, the chief of the tribe, because of his physical afflictions, being blind and enfeebled. The Government was to appropriate and expend $24,000.00 for agricultural machinery, horses, etc., etc., and pay for a period of twenty-five years certain agreed-upon annuities to be distributed per capita, diminishing in amount each five-year period. Briefly, the above covered the important provisions of the written agreement, with respect to which there is no controversy. The contention of the Indians, upon which this case is predicated, is that an oral agreement consummated before and as the inducing cause for signing the agreement of 1890, existed between the Indians and the commission, by the terms of which the commission agreed to thereafter increase the consideration for the cession of 1890 if similar agreements with neighboring Indians provided for a greater sum. It is conceded that the cession of 1890 was obtained for an average acreage price of 38 cents, and that 219,803 acres of surplus lands were obtained at this price. The difference between 38 cents and $1.25 per acre amounts to $193,253.00.
It was supposed by the commission and the Indians that the Iowa reservation contained a total of 219,803 acres of surplus lands; later an accurate survey increased the total acreage of 50,818 acres. The Government received from settlers $1.25 an acre for this acreage and the plaintiffs seek to recover the same; i. e., a total of $63,597.00.
The jurisdictional act contains certain provisions which we wish to emphasize by way of italics, viz: “for the determinar tion of the amowit, if any, which 'may be legally or equitably due said tribe * * * wider any stimulations or agreements, whether written or oral, * * * or for the failure of the United States to- pay any money which may be legally or equitably due said tribe of Indians.” The act as a whole clearly evinces a congressional intent to refer to this court the rights of the Indians growing out of the transaction *605 wherein the Indians ceded their lands to the Government and the Government assumed obligations to pay therefor. Congress, by the legislation, does not, of course, concede a liability; that is for this court to determine upon principles of law and equity. United States v. Mille Lac Indians, 229 U. S. 498. The subject matter of the suit is set forth in the act, and if the court finds that a legal or equitable obligation, which has not been fulfilled, results from the proceedings involved, judgment for the Indians necessarily follows. We say this not because of doubt, as to the extent of the court’s jurisdiction in the premises, for precedents are too numerous to cite sustaining the rule, but because at the outset the defendant challenges the right to consider the establishment of, or any liability under an oral agreement with the Indians. Defendant’s contention is rested upon a lack of authority upon the part of the commissioners to bind the Government by an oral agreement. There are no express provisions in the act of 1889 which directly prohibited an oral agreement. The lack of authority to enter into one is deduced from the directions to report any and all agreements consummated, as well as minutes of the proceedings to the President, to be by him transmitted to Congress for ratification. The instructions given the commission by the Indian Office are to the same effect. While authority to act is of vital importance, failure to report what actually transpired carries with it equal obligations. Surely it may not be. said that the omission of the commissioners to report an oral agreement to the President, and do what the act authorized and instructed them to do, concludes the rights of the Indians, if as a matter of fact a written and oral agreement were made. Congress did not circumscribe the authority of the commission to written agreements; all that was exacted was a detailed report of what was done. Naturally it would, in ordinary dealings between persons fully competent to contract, and standing upon an equal footing, be supposed that the terms of transfer of a vast acreage of valuable land would be evidenced by a written contract. Knowledge of a very different situation upon the. part of Congress, with respect to transactions of this character, leads to the enactment of remedial statutes, whereby the court may ascertain *606 judicially whether the commission did or did not obligate the Government to do certain things, irrespective of whether they in fact reported their complete proceedings of what was done. In the absence of some express inhibition which withheld from the commission the right to contract upon any other basis than a written contract, the court under the jurisdictional act possesses jurisdiction to inquire into and adjudicate reciprocal rights upon what was said to have been done, and precisely what contracts and the terms thereof were entered into between the commission and the Indians. If the .existence of an oral contract supplementary to and as understood by the parties to be part of the transaction, going directly to the consideration for the cession of the lands involved, was in fact consummated, then the written agreement reported does not reflect the true situation, resulting in the omission from the report to the President of an exceedingly important agreement.
In addition to the foregoing the special act confers jurisdiction upon the court to determine and adjudicate the issue as to whether there has been a failure upon the part of the United States to any money which may be legally or equitably due the Indians. The jurisdiction conferred by this provision is comprehensive. It is not confined to contracts, but obviously extends to a review of the transaction in all its detail and determine therefrom if either at law or in equity any obligation came into existence to pay the Indians certain sums. That Congress may enact legislation of this character is not denied, and the case of Lone Wolf v. Hitchcock, 187 U. S. 553, sustains the authority of Congress to deal with tribal Indians and tribal Indian funds as in its wisdom it sees fit. The report of the Committee on Indian Affairs, H. R. No. 581, Sixty-sixth Congress, second session, page 6, states:
“ It appears to this committee that in view of the facts and circumstances herein set forth an injustice has been done to the Iowa Tribe of Indians in Oklahoma, and that they have been induced to part with the residue of their reservation for a nominal consideration and with the understanding, at least on their part, that they would receive such additional compensation as might be given to adjoining Indian tribes holding lands of similar character. In view of the *607 fact that all Indian tribes contiguous and in the vicinity received much greater compensation for their residue lands than did the Iowas, and that they received only the small per capita allotments of 80 acres, and they were of such known friendly disposition that the Government agents went to them first in its policy of acquiring and opening to white settlement the surplus Indian lands, it would seem that these Indians have at least an equitable claim against the Government for an amount equal to that which other Indians of that locality received for lands of similar nature.”
Manifestly Congress was convinced that the report of the commissioners and the consummation of the transaction by them was fraught with binding incidents which were not expressed in the written contract, and even so, that the contract as written does not express the actual agreement made between the parties, and in and of itself reflects an unconscionable bargain. We think it hardly essential to cite a long list of cases sustaining our jurisdiction to grant relief under the circumstances recited, where special acts substantially similar to the present one have been enacted. The Supreme Court has uniformly recognized the great disparity in intelligence between Indian tribes and commissioners deputized to obtain a cession of their reservations. Contracts, treaties, and agreements as the result of such negotiations have been repeatedly before the courts, and without exception the actual agreement as understood by the Indians has been enforced when it is clearly established that equity affords relief. The tribal Indians, as wards of the Nation looking to the Government for protection of their rights, are not to be foreclosed from asserting equitable claims because of the existence of an agreement purporting to express but which does not the actual agreement made. United States v. Winans, 198 U. S. 371; Choctaw Nation v. United States, 119 U. S. 1. In the last case cited the Supreme Court, speaking of a special jurisdictional act similar in its scope to the present one, held that the act operated to reopen in its entirety the claims of the Choctaws growing out of a series of treaties as well as an award made by the Senate. The Choctaw case involved many questions relating to the payment of com *608 pensation for the loss of ceded lands, and in so deciding employed as a portion of the opinion the following language:
“ The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, * * * The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons equally subject to 'the same laws.”
See also In re Northern Pacific Ry. Co. v. United States, 227 U. S. 355.
The special jurisdictional act in the Sisseton and Wahpeton case, 277 U. S. 424, was not so broad or inclusive as the present one. In the Sisseton and Wahpeton ease jurisdiction was limited to claims growing out of treaties or laws of Congress, and this court held that the limit of judicial authority was the ascertainment of rights and performance of obligations under the express terms of the treaties and laws of Congress. The Supreme Court affirmed our conclusions. The present statute enlarges the authority of the court, as previously observed, and is not identical with the one in the Sisseton and Wahpeton case. It is difficult to construe by comparison jurisdictional acts; the verbiage of each differs materially, and the subject matter to be adjudicated varies. Congress evidently intends, by affording the opportunity of adjudicating. Indian rights, to see to it that all legal and equitable obligations emanating therefrom shall be fully discharged. It is not to be supposed that Congress intended for the court to depart from established legal principles and adjudicate the case upon any other basis, but if the proceedings as a whole as disclosed by the- record erect legal or equitable rights pro and con, the court we think under the act is authorized to determine the issue of liability thereunder. It is most difficult in view of the isolated provisions of each special jurisdictional act to ascertain the scope and meaning of one act upon what has been held as to previous ones employing different terms and referring to different subject matters and adjudicated *609 upon different records. Sights emanating from treaties, contracts, and oral agreements are uniformly involved, and if a single document or documents are alone in issue, the prescribed course of the court is definitely marked, but upon an allegation as herein presented, the issue revolves hot alone around the express contract but concerns an insistence that the written contract reported does not in all respects recite the actual agreement made and was procured by representations and promises which were not observed, and is by it's terms unconscionable. We think it apparent that allegations of this character are sufficient to invoke the application of principles of equity. This court in the early case of Braden v. United States, 16 C. Cls. 389, exhaustively discussed the principles of construction applicable to special jurisdictional acts, and what was there said seems to have met with the approval of the Supreme Court in many later decisions, quite too familiar to cite.
The facts established by the record, and not disputed, show a comparatively small Indian tribe residing on an Executive reservation in Oklahoma. The Indians were one hundred per cent illiterate, not one could read or write. The principal chief was blind and helpless. No tribal government of any consequence existed, and despite the value of their lands they were distressingly poor, and except for Government annuities were near the point of starvation. Without the slightest evidence of tribal cohesiveness and the existence of wide divergence of sentiment, they were subject to the influence of arguments and persuasions not alone from the commissioners’ intent on securing the reservation but from white settlers and others equally anxious for the surplus lands to become a part of the public domain. Under these circumstances and in consonance with the policy of the Government, it was manifestly the solemn duty of the commissioners to free their negotiations from all evidence of an intent to drive a bargain, and consummate only a just and fair settlement with an absolutely ignorant and dependent people. Without ascribing improper motives to the commissioners, the record at the very outset discloses an obvious and serious misconception of the Indians’ title *610 to their lands, and the making of representations to the Indians, calculated to inspire fear, which had absolutely no basis in law or fact. Again the record points out that it requiredpersuasion to induce the Indians to assent at all to the propositions of the commissioners, aside from the considerations offered in money and allotments. A special consideration was paid to one of the chiefs of the tribe, and despite all that could be offered or said, a considerable number of Indians absolutely declined to assent to the so-called agreement. We say this advisedly, for the anxiety of the commissioners to close the negotiations is evidenced by the fact that 62 out of a supposed total of 86 signed the agreement; 34 of the 62 were made up of members of but six Indian families, and one Indian and his wife not members of the tribe, as well as the signature of an unborn child, appear on the contract. Following the execution of the contract, allotments were made to 108 members of the tribe, so that in the end, as shown in Finding XII, the contract was assented to by 59 legitimate signatures, a small majority of the tribe. This is especially significant in view of the fact that no tribal government obtained, and the commission was put to the necessity of dealing with the Indians individually. Did the report of the commission and the contract transmitted reflect the actual agreement entered into and the terms thereof? We think it did not. The report contains the following paragraph:
“ The commission is aware of the very limited extent of the Iowas’ real title and interest in and to said tract of country, but their claim is absolute ownership, they believing, or assuming to believe, that an Executive order signed by the Great Father setting land apart for their permanent use and occupation, makes absolute title. The standard of intelligence among the Iowas makes it exceedingly difficult to make them understand that they have but a limited and qualified interest. Other negotiations in the Territory perfected and pending, and especially the Oklahoma purchase, have come to their knowledge, and their minds had become fixed upon allotments of one hundred and sixty acres to each member of the tribe and one dollar and a quarter an acre for the residue of the reservation; but the commission, knowing their title to be limited and their tenure even insecure, procured the contract herein described.”
*611 The quoted excerpt clearly discloses that tbe Indians did have fixed opinions upon the subject of their allotments in severalty and the price they should receive for surplus lands. It further shows that the very terms of the contract herein contended for were discussed and before the commissioners at the time the contract was signed. What then dissuaded the Indians and brought about a reversal of their “ 'fixed minds ” ? The commissioners say it was accomplished by a representation that their title to their lands was precarious; that the commission was “ aware of the very limited extent of the Iowas’ real title and interest in and to said tract of country” (italics ours), and thereby “procured the contract herein described.” In re Wilson, 110 U. S. 575. This is not all. In the present record is the oral testimony of witnesses, who are not Indians and in no way interested in the present litigation, one of whom was the clerk to the commissioners present when the negotiations continued, and the contract signed states with a degree of most convincing positiveness that the commissioners did agree that the Iowas were to get for their surplus lands the same as other Indian tribes, and this fact is distinctly corroborated by the positive testimony of several.other white witnesses, wholly disinterested parties. The anxiety of the commissioners to consummate an advantageous agreement with the Iowas is, in view of the history of the case, one perhaps not censurable, proceeding from the fact that the duty cast upon the commission included negotiations of a similar character with a number of Indian tribes occupying contiguous and near-by reservations, and the Iowas being the first tribe visited the terms of an agreement with them would be available as a persuasive argument to induce neighboring Indians to do likewise. Disregarding the testimony of the surviving Indians, which is not bereft of probative effect, and relying exclusively upon the evidence of outside parties, we think the evidence taken in connection with the circumstances of the case clearly establishes the existence of an agreement, the terms of which are not expressed in the written contract, that the Iowa Indians were to receive additional compensation if increased prices were paid for contiguous and adjoin *612 ing reservations composed of lands of no greater value and situated in the same locality.
The commission did visit Indians occupying contiguous reservations and did agree to pay $1.25 per acre for their lands, and it was paid by the Government for lands of no greater intrinsic value than the Iowa reservation. The reservations of the Sacs and Foxes and the Kickapoos, whose reservations adjoined the Iowas, were visited immediately after the negotiations with the Iowas, and to them $1.25 was paid for surplus lands, and what is more, the commission did not succeed in procuring any Indian surplus lands for a lesser price from any Indian tribes. The commissioners reported and it is borne out by the facts that the entire consideration for the Iowa contract averages thirty-eight cents per acre for their lands.
The plaintiffs cite innumerables precedents to sustain the case. We do not think it essential to encumber this opinion with quotations from them. If we are correct in our construction of the jurisdictional act, we think the judgment we .award follows.
The' remaining claim is not vigorously pressed. The treaty between the Iowa Indians and the United States made on May 17, 1854 (10 Stat. 1069), provided a fund for the Indians arising from the sale of Indian lands. The United States invested certain amounts of this fund in Federal and State ihterest-bearing bonds — the amount is not in dispute. Interest on the bonds was duly collected and credited to the Indians up to January 1, 1861. Some time during 1860 the bonds were stolen by a clerk in the Secretary of the Interior’s office. On July 12, 1862, Congress passed an act appropriating $66,735.00 to reimburse the Indians for the loss, and thereafter interest on this sum was credited semiannually to the Indians up to and including the year 1880. On April 1, 1880 (21 Stat. 70), the above sum was deposited in the Treasury to the credit of the Iowa fund, which fund bore interest at the rate of five per centum per annum. The sum of $5,032.23, the amount of interest accumulated upon the stolen bonds from the date of the last payment to the first day of July, 1862 — in accord with the reimbursement act — was duly credited to the Iowas on September 11, 1862. The Iowa *613 Indians assented to this legislation. The act required their assent as a condition precedent, and their assent was filed with the Secretary of the Treasury on November 25, 1862.
The petition seeks to recover an alleged difference between the cost price of the stolen bonds and the par value of the same with interest. In addition to the lack of proof to sustain the contention, it is clear from the recited facts that the claim is without merit.
Judgment is awarded the plaintiffs for $254,632.59. It is so ordered.
Sinnott, Judge; Green, Judge; Moss, Judge; and Graham, Judge, concur.