ROGUE RIVER TRIBE OF INDIANS et al.
v. UNITED STATES.

No. 45231.

Court of Claims.

Feb. 4, 1946.

Everett Sanders, of Washington, D. C. (John G. Mullen, of North Bend, Or., and E. F. Crawford, L. A. Gravelle, Douglas Whitlock, and Edward F. Howrey, all of Washington, D. C., on the brief), for plaintiffs.

Charles H. Small, of Washington, D. C., and J. Edward Williams, Acting Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

Twenty-seven bands and tribes of Indians instituted this suit. Prior to 1853 they, with several other tribes, lived in Oregon west of the Cascade Mountains between the south line of Oregon and the Columbia River.

Seven treaties are involved in the case. These treaties were made in 1853, 1854 and 1855 between the defendant and various plaintiff bands and tribes. Some of the tribes were included in more than one of the treaties.

There are two principal bases of these claims. First, that under the terms of the various treaties the United States became obligated to grant or cede to them permanent reservations; that in the fulfillment of this alleged obligation of the United States these Indians were moved from place to place and eventually located on the Coast or Siletz, the Grand Ronde and the Table Rock Reservations; that under the terms of these various treaties the plaintiffs acquired a title interest in the land and that the Government subsequently wrongfully deprived them of a portion of these lands.

The second phase of these claims is based on the allegation that as an inducement to surrender certain rights in the reservations and as a part of the expense of removal and reestablishment, the Government agreed to make certain payments, but later instead of meeting these obligations outright, the defendant by legislation required the Indians to work and earn such payments as a condition to receiving them, and in several other cases the defendant failed to make or expend sufficient appropriations to meet these obligations, and in some instances diverted a portion of the appropriations actually made to other purposes.

Two treaties were entered into with the Rogue River Tribe, one dated September 10, 1853, 10 Stat. 1018, the other dated November 15, 1854, 10 Stat. 1119. The Chasta Band, the Scoton Bands and the Grave Creek Band of Umpquas entered into a treaty dated November 18, 1854, 10 Stat. 1122.

According to the Treaty of September 10, 1853, supra, the Rogue River Tribe ceded and relinquished to the United States all their right, title and interest in the lands where they were then located, but it was agreed that they should be allowed to occupy temporarily a portion of the ceded territory, such portion being set out by metes and bounds in Article 2. It was agreed that the area should be deemed and considered an Indian reserve until a suitable selection should be made by the President of the United States for their permanent residence and buildings erected thereon and provision made for their removal. As a consideration such Indians were to be paid $60,000 in supplies, less $15,000 which was to be retained as compensation for property destroyed by such

Indians during the recent war. In addition to such $60,000 defendant further agreed to pay the sum of $15,000 in five equal annual installments commencing at the expiration of the previous payments. By the Treaty of November 15, 1854, supra, the Rogue River Tribe agreed that the same land should be jointly occupied along with such other tribes and bands of Indians as the United States should agree with by treaty stipulation or the President should direct, but that the annuity to the Rogue River Tribe, as prescribed in the Treaty of September 10, 1853, supra, should not be diminished thereby.

By the Treaty of November 18, 1854, supra, the Chasta Bands, the Scoton Bands and the Grave Creek Band of Umpquas ceded to the United States all that country described in Article 1 of such treaty, and agreed to move to the Table Rock Reservation. As a consideration defendant agreed to pay the said united bands the sum of two thousand dollars annually for 15 years, which sum was to be added to those secured to the Rogue River Tribe by the Treaty of September 10, 1853, supra, and the amount shared by the members of the united bands and of the Rogue River Tribe jointly and alike. There was also to be paid $6,500 for subsistence during the first year of their residence on such property. Other provisions of the treaty will be discussed later.

These were to be temporary locations and while they were to be considered a reserve until a suitable selection for a permanent residence should be made, there is no clause in either of the treaties which may be considered as an obligation on the part of the United States to vest title in any of these Indian bands or tribes to any of the designated lands, although there was an implied obligation that at some time a permanent residence should be established for them.

Pursuant to the terms of these three treaties the Chastas, the Scotons, the Grave Creek Band of Umpquas and the Rogue River Tribe were placed on the Table Rock Reservation in 1854 and 1855. Later a part of them were placed on the Grand Ronde Reservation, then known as the Yamhill River Reservation, where they remained until 1857, when with the exception of about one-third of the Rogue River Indians they were moved to the Coast or Siletz Reservation. In 1855 and 1856 some of the members of all four of these tribes and bands of Indians participated in what was known as the Rogue River War. The major portion of these Indians remained on the Coast or Siletz Reservation until 1875, when by Act of Congress such reservation was designated as the permanent reservation for them as well as other tribes and bands of Indians.

█ Plaintiff complains that the defendant never designated a separate permanent reservation. This is true, but with the numerous tribes and bands of Indians, some of them very small, that wandered over that section of the country and intermingled, it hardly seems practicable that each could have been given a separate and distinct reservation. We find nothing in any of these treaties that justifies the finding of an obligation on the part of the United States Government to establish separate reservations.

█ On September 19, 1853, 10 Stat. 1027, the Cow Creek Band of Umpquas agreed to reside on such reservation as might be selected for them under the direction of the President of the United States. They participated in the Rogue River War heretofore referred to. By none of these treaties were they given a grant or cession of land, and after the Rogue River War they were placed on the Grand Ronde Reservation and in May 1857 were transferred to the Siletz Reservation, where they have since resided. They are not entitled to recover on the basis of any lands wrongfully taken from them. Sioux Tribe v. United States, 316 U.S. 317, 330, 62 S.Ct. 1095, 86 L.Ed. 1501.

By the Treaty of November 29, 1854, 10 Stat. 1125, the Confederated Bands of Umpqua and Calapooia Indians residing in the Umpqua Valley entered into a treaty with the Government by the terms of which they agreed to remove to such reservation as might be selected for them by the direction of the President of the United States. They ceded certain of the lands owned by them and retained other lands described in such treaty.

They subsequently became confederated with the Mo-lal-la-las or Molel Tribe, under the Treaty of December 21, 1855, 12 Stat. 981, and soon thereafter were located on the Grand Ronde Reservation where they still reside.

█ The defendant contends that by agreeing to move to such reservation as the President might prescribe, and by agreeing

to become confederated with the Molel Tribe of Indians, they abandoned all rights to the tract of land which they had reserved out of the cession made to the defendant by the Treaty of November 29, 1854, supra. We can find no such relinquishment of their rights in the occupied portion of the reserved tract within the four corners of the Treaty of December 21, 1855, supra. According to the terms of that treaty, the bands of Umpquas and Calapooias reserved a specifically described tract of land and ceded a portion of the land which they owned. Since by no act of theirs did they apparently surrender the occupied part of the reserved tract, we are unable to find that their simple removal deprived them of their rights as stipulated in the treaty. The proviso of article 1 of such treaty of November 29, 1854, contains the following language:

"And when said removal shall take place, the particular tracts then actually occupied by said Indians, on the reserve herein described, according to the provisions of this treaty, and those occupied by Indians of other bands that may be located thereon, shall be sold by order of the President of the United States, and the proceeds of such sales expended in permanent improvements on the new reserve, for the use and benefit of the holders of said tracts respectively."

We find, therefore, that the bands of Umpquas and Calapooias are entitled to the value of that portion of the land reserved by them in the Treaty of November 29, 1854, supra, which they actually occupied at the time they were removed therefrom December 21, 1855, together with interest thereon to date of final judgment herein, less any amount of the proceeds of the sale of any such lands that may have been expended for them in accordance with the terms of such treaty, and less any offsets which an accounting may show to be proper. United States v. Creek Nation, 295 U.S. 103, 110, 55 S.Ct. 681, 79 L.Ed. 1331; Shoshone Tribe of Indians v. United States, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360.

■ The fifteen bands and tribes designated as "Confederated Bands of Indians residing in the Willamette Valley" are listed immediately following that language in the title of this suit. On January 22, 1855, 10 Stat. 1143, these several bands entered into a treaty by which they agreed to reside on such temporary reservation as might be made for them by the superintendent of Indian affairs, until a suitable district of country should be designated for their permanent home and proper improvements made thereon.

We find nothing in this treaty that can be construed as an obligation on the part of the United States to grant them exclusive rights to any specific area of land. Since 1855 they have remained on the land which is now known as the Grand Ronde Reservation. In fact, all of the plaintiff tribes and bands except the Rogue River Tribe, the Chasta Bands, the Scoton Bands and the Grave Creek and Cow Creek Bands of Umpquas, reside on the Grand Ronde Reservation. With the exception noted, we are unable to sustain plaintiffs' contention that the defendant deprived them of title to lands which had been set aside as a permanent reservation. The Coast or Siletz Reservation contained 2,000 square miles of territory. To sustain the contention that simply because tribes comprising a few hundred Indians were permitted to occupy this reservation under an Executive order they acquired a full title to this immense tract of land would be an extreme interpretation of the obligations of the United States Government toward the Indian. It would be as if the owner of a large ranch should tell one of his employees he was ultimately going to provide a home for him and that in the meantime he could reside at the ranch headquarters. Surely no one would contend that the employee acquired a vested interest in the entire ranch. As a matter of fact, the Executive order, under the facts of this case did not amount to the establishment of a permanent reservation. This did not become a permanent reservation until the later act of Congress. Alcea Band of Tillamooks v. United States, Ct.Cl., 59 F.Supp. 934.

■ It must be admitted that the defendant was rather slow in making the permanent provision for these Indians. It did, however, provide a temporary place for them and gave them full use of the land to which they were assigned. It may be said in justification for the course which the defendant pursued that the tribes and bands were so numerous and so inclined to roam as to make it very difficult for the Government to make specific designation at an earlier date than it was made. At any rate, by the Act of March 3, 1875, 18 Stat. 420, 446, final provision was made for a permanent reservation and this together with Executive orders following and the act approved August 15, 1894, 28 Stat. 286, 323,

substantially discharged the landed obligations which defendant owed to the plaintiffs, with the exception of the bands of the Umpquas and Calapooias heretofore referred to.

As to the second phase of plaintiffs' claim, designated by the defendant as minor claims, the defendant has not fully discharged its obligation. It agreed to make certain payments to these various tribes and bands of Indians as an inducement to surrender certain privileges.

However, apparently with the approval of the Commissioner of Indian Affairs, the Congress by the Act of March 3, 1875, 18 Stat. 449, 25 U.S.C.A. § 137, stipulated that in distributing the supplies and annuities to the Indians for whom the same are appropriated, the agent distributing such annuities and supplies shall require all able-bodied male Indians between the ages of 18 and 45 to perform services upon the reservation for the benefit of themselves or of the tribe at a reasonable rate to be fixed by the agent in charge and to an amount equal in value to the supplies to be delivered.

We regard this as a plain violation of the terms of the treaty insofar as it applied to that portion of the obligations theretofore undertaken which remained unsatisfied. The excuse which the Secretary of the Interior offers for this provision is that it was wise that all annuities should hereafter be paid only in return for some form of labor.

By no stretch of the imagination can we justify such action. The payments were definitely promised as an inducement for the Indians to move to other land and as a part of the expense of such removal and rehabilitation. To require them to do further work to earn such payments cannot be justified. Whether it was wise that the Indians should work was beside the question. The defendant had undertaken an obligation. We are unable to cut any legal cloth to fit any such pattern as this.

The report of the Secretary of the Interior shows clearly that this provision was enforced. The plaintiffs, therefore, are entitled to recover that part of the appropriations that were thereafter expended to discharge outstanding treaty obligations in respect to annuities and supplies which the defendant had theretofore obligated itself to furnish. The defendant, of course, had the right to make such a condition as to treaties and obligations thereafter entered into.

Most of the treaty periods for annuities and supplies to be furnished to plaintiff Indians under the treaties involved in this suit had expired, or were soon to expire. The expiration dates are set out in finding 35. Those remaining unsatisfied at the time the work order was placed in effect totaled $3,606.48. We have eliminated the pay of blacksmith and strikers as this could hardly be classified as either annuities or supplies.

Of these sums $569.07 was incurred under the Treaty of September 10, 1853, supra, which the Rogue River Tribe of Indians is entitled to recover; $1,198.19 was incurred under the Treaty of November 29, 1854, supra, and is entitled to be recovered by the confederated bands of Umpquas and Calapooia Indians of the Umpqua Valley; and $1,839.22 was incurred under the Treaty of January 22, 1855, supra, which the Confederated Bands of Indians residing in the Willamette Valley are entitled to recover.

## Administrative Expense

The various items of administrative expense set out in finding 35 were improperly charged to the funds of plaintiff Indians. Seminole Nation v. United States, 102 Ct.Cl. 565, 624, 626, certiorari denied 66 S.Ct. 24. These sums are relatively small and as indicated have been added to the sums for which recovery has been allowed under the next subheading.

## Unexpended Treaty Funds

Some of the funds actually appropriated to meet the obligations of the various treaties were not expended for the benefit of the Indians as provided. These sums as listed below are in addition to those allowed under the work order.

Under the Treaty of September 10, 1853, the Rogue River Tribe is entitled to recover $3,849.16, plus $165.07 administrative expense, or a total of $4,014.23.

Under the Treaty of November 18, 1854, the Chastas, Scotons and Grave Creek Band of Umpquas are entitled to recover the sum of $10,224.34, plus $4,695.69 administrative expense, or a total of $14,920.03.

Under the Treaty of September 19, 1853, the Cow Creek Band of the Umpqua Tribe of Indians is entitled to recover administrative expense in the sum of $98.08.

Under the Treaty of November 29, 1854, the Confederated Bands of Umpquas and

Calapooia Indians of the Umpqua Valley are entitled to recover $12,585.81, plus $531.88 administrative expense, or a total of $13,117.69.

Under the Treaty of January 22, 1855, the Confederated Bands residing in the Willamette Valley are entitled to recover $554.52 plus $817.78 administrative expense, or a total of $1,372.30.

Under the Treaty of December 21, 1855, the Mo-lal-la-las or Molel Tribe of Indians are entitled to recover $37,255.29, plus administrative expense in the sum of $151.53, a total of $37,406.82.

Under Article 6 of the Treaty of December 21, 1855, the Mo-lal-la-las or Molel Tribe of Indians is entitled to recover $12,000 stipulated in such article for which no specific appropriation was ever made.

The Indians who were located on the Siletz Reservation on December 21, 1865, are entitled to recover the sum of $6,000 appropriated July 27, 1868, for losses sustained by reason of Executive order dated December 21, 1865, taking from them a portion of their reservation known as Yaquina Bay. This sum was expended for Indians under the Treaty of November 29, 1854, who were located on the Grand Ronde Reservation, and other tribes confederated with them. The defendant is entitled to credit against the latter Indians for the amount of this appropriation which was improperly diverted to them.

We do not think the plaintiff Indians are entitled to recover for the wheat land since these lands were actually purchased and utilized for the benefit of the various tribes of Indians.

Some of the funds referred to in findings 28 to 35 were not made available in sufficient amounts to satisfy the obligations which the defendant had undertaken, and some of the funds actually made available were diverted to purposes other than those obligations. It is difficult to trace these funds from the records that are available. We have undertaken to do so in as accurate a manner as the records will permit. We have allowed recovery only of those items which the records show clearly are unsatisfied.

Plaintiff bands and tribes are entitled to recover the sums indicated to the extent that they may exceed any allowable offsets to which the defendant may show itself entitled under Rule 39(a). With the exception of the recovery of the value of land under Article 1 of the Treaty of November 29, 1854, the plaintiffs are not entitled to recover interest on these deficiencies under the Jurisdictional Act and for the further reason that the record does not establish that the failure to comply with treaty obligations was under such circumstances as would entitle the plaintiff bands and tribes to interest as a part of just compensation. Choctaw Nation v. United States, 91 Ct.Cl. 320, 402, 403.

Judgment for the amount of compensation to which the plaintiff tribes the Umpquas and the Calapooias of the Umpqua Valley may be entitled by being deprived of their rights in the land which they had reserved under the Treaty of November 29, 1854, and the determination of the amount of offsets, if any, to any of the above claims, are reserved for further proceedings under Rule 39(a).

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.