ROGUE RIVER TRIBE OF INDIANS et al.
v. UNITED STATES.

No. 45231.

United States Court of Claims.

April 3, 1950.

Louis A. Gravelle, Washington, D. C., for the plaintiffs. Everett Sanders, Washington, D. C., John G. Mullen, North Bend, Or., E. L. Crawford, Salem, Or., Edward F. Howrey and Douglas Whitlock, Washington, D. C., were on the briefs.

Clifford R. Stears, Portland, Or., with whom was Assistant Attorney General A. Devitt Vanech, for the defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Judge.

This suit was originally brought by plaintiffs under the Act of August 26, 1935, 49 Stat. 801, which gave this court jurisdiction to "hear, examine, adjudicate, and render final judgment (a) in any and all legal and equitable claims, arising under or grow-

ing out of any treaty, agreement, Act of Congress, or Executive order, or for the failure of the United States to pay any money or other property due, which those Indian tribes or bands, or portions thereof, and their descendants, described in the ratified treaties of September 10, 1853 (10 Stat. 1018), September 19, 1853 (10 Stat. 1027), November 18, 1854 (10 Stat. 1122), November 25 [sic], 1854 (10 Stat. 1125), January 22, 1855 (10 Stat. 1143), and December 21, 1855 (12 Stat. 981), may have against the United States." In a decision dated February 4, 1946, 64 F.Supp. 339, 105 Ct.Cl. 495, we held that the Confederated Bands of Umpquas and Calapooia Indians of the Umpqua Valley were entitled to recover the value of the land reserved by them under the Treaty of November 29, 1854, 10 Stat. 1125, and actually occupied by them at the time of their removal from the reservation, and that these Indians and certain others were entitled to recover the respective amounts set forth in that decision to the extent that they exceed any allowable offsets to which defendant might show itself entitled under 39 (a), Rules of Court of Claims, 28 U.S.C.A.

A further hearing has been held and the case is now before us to determine the extent of the lands actually occupied by the Confederate Bands of Umpquas and Calapooia Indians of the Umpqua Valley and the amount of compensation to which they are entitled, measured by the value of the lands taken on December 21, 1855, plus an additional amount measured by a reasonable rate of interest to make just compensation. From this and from the respective awards made in the earlier decision, must be offset amounts expended by the Government as gratuities on behalf of the various claimants, and the amount of each tribe's proportionate share of the $6,000 awarded to the Indians on the Siletz Reservation.

Plaintiffs Umpquas and Calapooia Indians of the Umpqua Valley contend that the entire reservation described in their treaty of November 29, 1854, was actually occupied by them until December 21, 1855, no other Indians sharing in that occupancy; that the value of the land in the reservation as of December 21, 1855, was between four and five dollars per acre; that five percent is a reasonable rate of interest to be added as part of just compensation, and that any setoffs should be against the final award.

The defendant contends that the record contains no proof of the exact location or size of the reservation; that plaintiffs have failed to show actual occupancy of any part of the area claimed; that the value of the land claimed was less than ten cents per acre on the date of taking; that set-offs for gratuitous expenditures on the part of the Government should be proportioned annually according to the amount spent in each year since 1855 before calculating the additional amount, measured by interest, for that year, in order to make just compensation; and that a fair rate of interest to make just compensation is four percent.

■ As to the question of the size and location of the reservation, we are of the opinion that the description (finding 1) contained in the first article of the Treaty of November 29, 1854, 10 Stat. 1125, the map prepared from that description by the Department of the Interior, and the Department's estimate of the approximate area involved, indicate that the reservation contained approximately 67,820 acres of land in the Umpqua Valley in Douglas County, Oregon, and we have so found (finding No. 3).

U.S. COURT OF CLAIMS No. 45231
UMPQUA INDIAN RESERVATION
WILLAMETTE MERIDIAN
OREGON

CONFIDENTIAL

☒ JOHN CHURCHELL CLAIM
☒ ALLAN HUBBARD CLAIM

CONFIDENTIAL

On the question of occupancy, we have found (finding No. 2) that the Umpquas and Calapooias were, within the meaning of their treaty, in actual occupancy of all the land reserved to them in the first article of their treaty. At the time the treaty was signed, they were in actual occupancy and possession of all the land described in the treaty, including the tract reserved. In allowing plaintiffs to reserve so large a tract, the Government undoubtedly contemplated the possibility of designating other tribes of Indians to reside on the reservation, and it reserved its right to do so. There is no proof that the Government ever exercised this right. Late in 1855 when the Rogue River War broke out, a few members of the Molel Tribe and of the Cow Creek and Looking Glass Bands were moved on to the reservation as a measure of protection against the hostility of the white settlers and just prior to the removal of those Indians to the Grand Ronde Reservation, but they were not designated by treaty or other official act to reside on the reservation retained by the Umpquas and Calapooias. It is true that the Umpquas and Calapooias did not, on November 29, 1854, immediately assemble on the tract reserved in their cession treaty of that date. At that time the confederated bands consisting of some 337 Indians were scattered from Scottsburg to the Cascade Mountains. Between November 29, 1854, and November 15, 1855, the majority of these Indians moved on to the reservation and remained there until the removal. A small number of these Indians farmed tracts of land on the reservation and erected some improvements on their small farms. The others were scattered over the reservation in small groups of one or more families who lived in native lodges and subsisted off fruit, fish and wild game. A few worked for the white settlers living near the reservation. Except for those engaged in farming, their occupancy was the sort of general possession common to the habits and mode of life of Indians who live principally by hunting and fishing. We find nothing in the record or in the treaty to indicate that the term "actual occupancy"

meant anything other than the usual mode of occupancy of Indians at that time. The fact that no portion of the reservation was surveyed into lots or allotted to any individual members or families pursuant to the fifth article of the treaty is not surprising in view of the fact that no other Indians were designated to reside on the reservation. If other Indians had been so designated, it would have been necessary to designate particular tracts on the reservation for the occupancy of the Umpquas and Calapooias. By the act of March 3, 1855, 10 Stat. 674, Congress appropriated $23,980 for fulfilling the articles of the treaty with these Indians by way of erection of improvements on the reservation. The commencement of the Rogue River War convinced General Palmer that these Indians would have to be moved and few, if any, of the improvements were made. Almost immediately after the signing of the Treaty of December 21, 1855, 12 Stat. 981 ratified in 1859, by which the Molel Band was confederated with the Umpquas and the Calapooias, all the Indians assembled on the reversation, and the Umpquas and Calapooias were moved to the Grand Ronde reservation. Thus, even if the Molels can be said to have been designated to share the reservation, they never actually occupied any portion of the land.

There remains the problem of determining the value on December 21, 1855, of the 67,820 acres of land in the reservation belonging to the Umpquas and the Calapooias (hereinafter referred to as plaintiffs). The testimony introduced by the parties and the exhibits offered in evidence, in general followed the same lines as in the case of Alcea Band of Tillamooks v. United States, Ct.Cl., 87 F.Supp. 938, No. 45230, involving nearly three million acres of land lying just west of the plaintiff's reservation and bordering on the Pacific Ocean. The Umpqua tract was much smaller and this fact, for sale purposes, would be an advantage. However, as appears from our findings of fact, the valuable timber which covered most of the tract and was of the same general character as that found on the Alcea tracts, was not as accessible, there was no

gold or coal actually mined on the tract, and the commercial potentialities were not as attractive as on the Alcea tract with its several ocean harbors.

■ The various elements of value which we have considered and described in detail in our findings of fact, may be summarized as follows: the location of the tract and its physical characteristics; the development of the surrounding area at the time of the taking; actual disposals of the tribal lands after the taking by the Government; private sales of similar lands bordering on the reservation; sales of land in the tribal area by the Oregon and California Railroad; agricultural and timber value of the reservation.

The reservation was located in the Umpqua Valley in Douglas County, bounded on the west by the Coast Range of mountains which have a maximum elevation in this area of about 2,500 feet. It lies almost entirely in Townships 24S and 25S, Ranges 7W and 8W, with a small portion in Township 26S, Ranges 7W and 8W, and even less in Townships 24S and 25S, Range 6W. The Umpqua River enters the reservation near its southeast corner, flows through it in an irregular course to the north and northwest and then west into the Pacific Ocean. There are a large number of streams and creeks in the reservation which flow into the river. The town of Scottsburg was just to the northwest of the reservation, and the town of Roseburg to the southeast. The Umpqua River was an important avenue of transportation at that time before the building of railroads, and was navigable from the Pacific Ocean to Scottsburg, about 20 miles from the reservation. There was evidence of navigation by small craft on the river through the reservation between Scottsburg and Roseburg. Although the greater portion of the reservation was best adapted to the growing of timber, there was good agricultural and grazing land in the long narrow valleys and along the river and creeks. The soil was fertile and well adapted to the growing of farm crops, fruits and vegetables; water for human consumption was abundant and the climate mild and not subject to extremes. The population of Douglas County in 1860 was 3,167 (the population of Oregon as a whole was then 52,-456). There were 12 towns in Douglas County, including Roseburg with 835 people, ten miles from the reservation, and Winchester with 412 people, eight miles from the reservation.

The first road on the reservation was constructed in 1856 by General Sheridan in connection with the Rogue River War, although there were pack trails along the Umpqua in the reservation branching from the main pack trail going from Scottsburg to Winchester and the Rogue River mines. By the Act of March 3, 1853, 10 Stat. 214, Congress authorized a survey to ascertain a feasible route for a railroad from California to Northern Oregon and the survey party passed through Douglas County in October 1855. The proposed route, published shortly thereafter, ran through Roseburg, Oregon, parallel to and about 12 miles from the reservation. The actual grant of land to the railroad, Act of July 25, 1866, 14 Stat. 239, completely blanketed the reservation and all odd-numbered sections therein were withdrawn for the benefit of the grantee.

On the date of taking, December 21, 1855, title to all the lands in the reservation passed to the Government, and the first survey of land in the reservation was made in July 1856. Only 320 acres of reservation land were included in this survey. From the date of taking to 1863, land in the reservation could be acquired under the Preemption Act, 5 Stat. 453, extended to Oregon by the Act of July 17, 1854, 10 Stat. 305, the Public Sale and Private Entry Act. 3 Stat. 566, extended to Oregon by the Act of February 14, 1853, 10 Stat. 158, and by the location of military land bounty warrants, Act of February 11, 1847, 9 Stat. 125. No patents of public land could issue until there had been a survey. The Oregon Donation Act, 9 Stat. 496, had expired on December 1, 1855, just prior to the time the Indian title to this area was extinguished, but some land in the reservation had been

settled under that act and patents later issued covering 389 acres of land so settled.

The Pre-emption Act permitted the acquisition of 160-acre tracts by actual settlers at $1.25 per acre after one year of residence on the land claimed, the erection of a dwelling and the making of improvements. Under the Public Sale and Private Entry Act, public lands which had been surveyed and offered could be sold to the highest bidder at public sale, but not for less than $1.25 per acre. Military bounty land warrants issued to honorably discharged privates or noncommissioned officers could be used to locate on 160 acres of public land subject to sale at private entry at any land office in the United States.

Under the Homestead Act of May 20, 1862, 12 Stat. 392 settlers could make free entry on 160 acres of public land selling at $1.25 per acre, or on 80 acres of public land selling at $2.50 per acre, and could acquire title after five years of residence thereon plus cultivation and the making of improvements. Patents could be secured before the lapse of five years' residence by the payment of the minimum price for the land claimed.

Land in Oregon could also be acquired by the use of Agricultural College Scrip, Act of July 2, 1862, 12 Stat. 503, 7 U.S.C.A. § 301 et seq. No scrip was issued in Oregon, which had sufficient public land available to fill its allotment under the act. Scrip from other states not having sufficient land to make up their quotas could be used to locate on public land anywhere in the United States subject to sale at private entry.

Most of the land in the reservation was timberland which was not suitable for settlement and although this land could have been acquired under the various land laws mentioned above, the Donation Act, the Homestead Act, and the Pre-emption Act all required actual residence and the making of improvements on the lands claimed. By the Act of June 3, 1878, 20 Stat. 89, Congress authorized the sale of Oregon timberlands unfit for cultivation in 160-acre tracts for $2.50 per acre.

With respect to all the above land laws, no patents could issue to settlers until the land in question had been surveyed. As of 1876 approximately 20,434 acres of land in the reservation had been surveyed. Of the approximately 33,000 acres of land in the reservation not granted to the Oregon and California Railroad and remaining for the Government to dispose of, 13,366 acres had been surveyed by 1876 and approximately 5,845 acres of such land had been disposed of by the Government as follows:

|  | Acres patented |
|---|---|
| Cash sales | 2,890 |
| Pre-emption Act | 231 |
| Military bounty | 288 |
| Agricultural college scrip | 160 |
| Donation Act | 389 |
| Homestead Act | 693 |

1,194 acres of this surveyed land was granted as school sections.

After 1876 patents were issued covering 4,927 acres of land settled under the Homestead Act. There is no indication in the record as to when these acres were first settled and it is possible that some of them were settled prior to 1876. Persons who acquired land under the free land acts were not required to apply for patents immediately upon the expiration of the required period of residence and there is evidence that applications for patents were not always made promptly.

As pointed out above, the reservation lay entirely within the lands granted to the Oregon and California Railroad and on April 25, 1870, approximately 31,000 acres of land in the odd-numbered sections in the reservation were withdrawn from entry for the purposes of the grant. All of the O. & C. lands in this area were "primary limit" lands. Pursuant to the act, the grantee from time to time selected tracts of land which were eventually patented to it. On April 10, 1869, the act was amended, 16 Stat. 47, to provide that the grantee might sell the land granted to settlers only, in quantities of not more than 160 acres to each purchaser, and for a price not to exceed $2.50 per acre. Section 2

of the original act, 14 Stat. 239 provided that the alternate (even-numbered) sections of land retained by the Government would not be sold for less than $2.50 per acre. As time went on, it became apparent to the Government that the grantee was violating the conditions of. the amended act by selling to other than settlers tracts of land in excess of 160 acres and for prices far greater than $2.50 per acre. In 1908 the United States brought suit against the grantee and in 1915 the Supreme Court upheld the Government's position. Oregon & California Railroad Co. v. United States, 238 U.S. 393, 35 S.Ct. 908, 59 L.Ed. 1360. By the Act of June 9, 1916, 39 Stat. 218, the greater portion of the granted lands within the reservation (27,027 acres) was revested in the Government. Apparently the grantee had elected to sell to settlers only 2,389 acres of the grant lands. Since many considerations undoubtedly entered into its decision to sell or retain primary limit lands, and since there is little evidence on this matter in the record, we draw no conclusion from such fact.

Subsequent to the passage of the Timber and Stone Act in 1878, 16,083 acres of timberland located on the even-numbered sections retained by the Government were sold at an average price of $2.52 per acre. These sales took place between 1883 and 1913. The acreage involved in these sales had been surveyed as follows: 2,800 acres in 1858, 1,242 acres in 1875, 4,600 acres in 1882, 6,177 acres in 1895, 2,360 acres in 1897, and 266 acres in 1905.[2]

Inasmuch as none of the land in the reservation was privately owned in 1855, there is no evidence of the market price of the land as between private buyers and sellers. The record does contain evidence of private sales of some 63 tracts of land in Douglas County between April 1, 1856, and October 12, 1860, for an average price of $5.33 per acre (15,768.71 acres for $84,140). Twenty of these sales involved land located in townships adjoining the reservation and there were four sales of land in a township in which part of the reservation was located. The record does not disclose whether the land was improved or unimproved. If improved, the record indicates that the value of improvements on Oregon land at that time was a little over nine percent of the total value.

As pointed out above, most of the acreage in the reservation consisted of timberland and the Douglas fir trees of sawlog size on the reservation on December 21, 1855, constituted its most valuable resource. Pursuant to the McSweeney-McNary Forest Research Act of 1928, 16 U.S.C.A. § 581 et seq., a survey was made of the Douglas-Fir Region in 1933, including the land in suit. The area was classified on an acreage basis and an ascertainment made of the volume of timber of the various types and classes. The following summary, based on information in the survey, shows the classification of the lands of the reservation and the acreage of each class at the time the survey was made in 1933:

| Size or condition class: | Area (acres) |
|---|---|
| Old-growth Douglas fir | 34,890 |
| Large second-growth Douglas fir | 15,255 |
| Small second-growth Douglas fir | 6,145 |
| Seedling and sapling Douglas fir.. | 2,715 |
| Oak madrone | 275 |
| Non-stocked cutovers and burns | 2,190 |
| Deforested burn in agricultural use for grazing | 3,900 |
| Agricultural land—cultivated ... | 2,145 |
| Noncommercial forest land and nonforest land | 305 |
| Total | 67,820 |

The following table has been computed from the records compiled in the survey and shows the volume of the timber on the reservation at the time such survey was made:

| Species: | Thousand board feet, log scale |
|---|---|
| Douglas fir old growth, more than 40 inches d. b. h. | 1,029,411 |
| Douglas fir old growth, 22 to 40 inches d. b. h. | 205,926 |

2. Acreage in each case approximate.

806

| Species—Cont'd | Thousand board feet, log scale |
|---|---|
| Douglas fir large second growth, 22 to 40 inches d. b. h. | 547;560 |
| Douglas fir small second growth, 16 to 20 inches d. b. h. | 38,850 |
| Western hemlock | 23,017 |
| Western red cedar | 18;413 |
| Grand fir | 13,986 |
| Incense cedar | 128 |
| Port Orford white cedar | 40 |
| Red alder | 3,282 |
| Oregon maple | 4,595 |
| Oregon oak | 330 |
| Chinquapin | 3,282 |
| Madrone | 13,128 |
| Total | 1,901,948 |

Between December 21, 1855 and 1933, the stand and character of the timber on the reservation were somewhat affected by growth of trees, forest fires, logging operations, losses due to diseases and storms, and by burning and clearing of land for agricultural purposes. As we have found (finding 9) there were no large areas on the reservation damaged by fire since 1855 and, on the basis of the available records and inspection of the reservation, it is possible for one trained and experienced in forestry to reconstruct with a fair degree of accuracy the amount and character of timber on the land in 1855. The evidence supports the conclusion that there were approximately the same types and volume of saw timber on the reservation in 1855 as in 1933 and that with the exception of the 2,190 acres of non-restocked cutovers and burns and the 3,900 acres burned to make grazing land, the acreage classification of the land in 1855 remained about the same.

Defendant contends that the timber on the reservation had no value in 1855. The record in this case indicates that for more than 100 years lumbering has been one of the principal industries in Oregon. The first sawmill in the Oregon region was erected in 1827 near Fort Vancouver on the Columbia River, and lumber was exported from this mill to Hawaii. Between 1840 and 1850 a number of other sawmills were established to supply the demands of the increasing local population and for export to the gold fields of California, to San Francisco and to the Hawaiian Islands. The first sawmill in the area of the reservation was constructed about 30 miles from the reservation in 1860. Logging operations were conducted in the Umpqua Valley on a limited basis for many years but it was not until 1925 that lumbering in this area began on a large scale, following the depletion of stumpage in western Washington and northwestern Oregon. In this connection, however, it should be noted that approximately one-half the area in suit was, until 1916, owned by the Oregon & California Railroad and could not be sold to lumber companies but only to settlers. After the passage of the Timber and Stone Act in 1878, most of the timberland reserved by the Government on the reservation and not withdrawn for public purposes, was sold by 1904 at an average price of $2.52 per acre. With respect to the O. & C. revested lands, no sales of the lands could be made until the merchantable timber had been removed and the Government made no sales of that timber until 1942.

We have found (finding 10) that logging on the reservation would have been possible in 1855. The boundaries of the reservation generally followed the ridges, and the creeks flowing down to the Umpqua River would have facilitated logging since the logs could have been moved downgrade to the Umpqua River. With the use of splash dams which could have been constructed in the shallow places at low water times, logs could have been floated down the river to the ocean.

On the basis of all the evidence in this case we are of the opinion that if the timberlands in this area had been available and offered for sale by or around 1855, in tracts of sufficient size to attract the interest of lumber companies, most of the land would have been purchased, particu-

larly since people generally were aware of the promising future of the lumber industry in Oregon. While the timber on this tract was not as accessible commercially as that on the Alcea tract, it was, with the qualifications pointed out above, accessible.

Gold was discovered in California in 1848 and in Oregon in 1852. This circumstance accelerated the settlement of the Oregon Territory and provided lucrative markets for timber and for Oregon agricultural products. The gold discoveries just south of the reservation attracted a large transient population in great need of the products which could be produced in the neighborhood of the reservation. The reservation contained about 8,000 acres of land well suited to farming and grazing, and there was an abundance of fish and wild game in the hills and mountains.

■ In 1855 this reservation was located in an area where settlements on its edges were thriving and increasing in population. There was a demand for the agricultural products and the timber of this area, and the actual disposals of land in the reservation for the first 20 years after the taking, evidenced a market for the land itself. The price paid by the Government to Indians under cession agreements for other land in Oregon at about this time is not, as contended by the defendant, a good indication of the fair value of plaintiffs' land. Alcea Band of Tillamooks v. United States, No. 45230; Iowa Tribe of Indians v. United States, 68 Ct.Cl. 585; Blackfeet Nations v. United States, 81 Ct.Cl. 101; Shoshone Indians v. United States, 85 Ct.Cl. 331.

■ From the record as a whole, we conclude that the lands taken had an average value of $1 per acre on December 21, 1855, taking into consideration the factors set forth above, the fact that some of the land was of little value then and today, and allowing for the reasonable costs of making all necessary surveys and supervising the disposition of the lands. Accordingly we hold that the value of the reservation on December 21, 1855, was $67,820.

■ In the Alcea case we dealt with defendant's contention that any setoffs should be proportioned annually since 1855 before calculating and adding the additional amount measured by interest for each year in order to make just compensation, and found it to be without merit.

■ On the question of the proper rate of interest as a measure of the additional amount to make just compensation, defendant in contending for four percent from 1855 rather than five percent, has added nothing to the arguments it made in the Alcea case, and we shall accordingly abide by our decision in that case and find five percent to be a reasonable rate for the period from December 21, 1855 to December 21, 1934, and four percent to be reasonable from December 21, 1934 to the date of judgment herein, April 3, 1950. The additional amount so measured to which plaintiffs are entitled is $309,357.16, making the total amount due plaintiffs Umpqua and Calapooia Indians of Umpqua Valley on April 3, 1950, $377,177.16 for the land.

To the above amount must be added $14,315.88, the amount of the judgment awarded these plaintiffs in the former case, making a total amount due them on April 3, 1950 of $391,493.04. From this amount, however, defendant is entitled to offset $48,028.30, representing certain gratuities expended by the Government in behalf of these plaintiffs, and also $1,014 improperly diverted to these plaintiffs and which the Government was held liable to pay to the Indians on the Siletz Reservation. The deduction of these two amounts leaves $342,450.74 due plaintiffs Umpqua and Calapooia Indians of the Umpqua Valley, for which judgment will be entered in their favor. They are also entitled to an additional amount as part of just compensation measured by interest at the rate of four percent per annum from the date of judgment, April 3, 1950, to the date of payment, on the principal sum of $67,820.00.

With respect to the other seven tribes of plaintiff Indians, we held in our former decision 64 F.Supp. 339, 105 Ct.Cl. 495, that they were entitled to recover certain

sums to the extent those sums might exceed any allowable offsets to which defendant showed itself to be entitled. The offsets representing gratuities which had been expended up to July 1, 1943 (finding 13), equal the respective amounts of this court's awards to the Rogue River Tribe of Indians, the Chastas, the Scotons, the Grave Creek Band of Umpquas, the Cow Creek Band of Umpquas, and the Confederated Bands of Indians residing in the Willamette Valley, and, accordingly, there is no balance due them for which judgments can be awarded and as to them the petition is dismissed.

In the case of the Mo-lal-la-las or Molel Tribe of Indians, we have found (finding 13) that the defendant is entitled to offset $13,722.37 representing gratuities expended up to July 1, 1943, and (finding 14) $687.-60 representing this tribe's proportionate share of the $6,000 wrongfully diverted to the tribe and paid by the defendant to the Indians on the Siletz Reservation. The sum found due the Molel Tribe in our former decision ($49,406.82) exceeds these allowable offsets by $34,996.85 and the Tribe may have judgment for that amount.

Judgments will be entered as indicated above for The Confederated Bands of the Umpqua Tribe of Indians and the Calapooias residing in the Umpqua Valley and for the Mo-lal-la-las or Molel Tribe of Indians. It is so ordered.

HOWELL, MADDEN, WHITAKER, and LITTLETON, Judges, concur.