*174 The opinion of the court fer curiam is. as follows:
Following extensive hearings in this court and, in the case of Alcea Band of Tillamooks, also in the Supreme Court of the United States, judgments have been entered as follows:
Case No. 45230:[1]
Tillamooks_' $960, 497.95
Coquille- 625,481.88
Tootootoney___ 320, 781.26
Chetco- 353,225. 81
Case No. 45231:[2]
Molel or Molallalas- 34,996.85
Confederated Bands of the Umpqua Tribe and the Calapooias residing in the Umpqua Valley_ 342,450. 74
Plus 4 percent interest on principal amount of $67,820 from date of judgment (April 3, 1950) to date of payment.
The attorneys for the plaintiffs in both cases are the same. They have moved the court to award as attorneys’ fees. 10 percent of the amounts recovered as permitted by the jurisdictional act and their contracts. They have also moved the court to order the reimbursement to them of cash advanced as expenses necessary and proper in the preparation and prosecution of the suits, and to fix the amount, and order the payment of, reasonable compensation for the expert services rendered by Messrs. E. O. Fuller, C. Weldon Kline, and George B. Wasson, also as expenses necessary and proper in the preparation and prosecution of the suits.
ATTORNEYS’ PEES
The jurisdictional act[3] contains the following provisions relative to fees and expenses applicable to both cases:
*175 Sec. 3. That upon final determination of such suit, or suits, the Court of Claims shall decree such fees not exceeding 10 per centum of the amounts recovered as it shall find reasonable to be paid the attorney or attorneys employed therein by said Indians or bands of Indians, under contracts negotiated and approved as provided by existing law, together with all necessary and proper expenditures incurred in the preparation and prosecution of the suit or suits.
Contract No. 12606, dated April 2, 1937, between plaintiffs in the Alcea case and the attorneys, as amended May 27,1940, and as modified and extended by contract No. 18342, dated November 1, 1946, provides that this court shall determine the attorneys’ fees equitably due for the services rendered, in an amount not to exceed ten per centum of the sums recovered. Contract No. 17480, dated August 5, 1940, between plaintiffs in the Rogue River case and the same attorneys, as extended September 11, 1950, contains substantially the same provision with respect to the award of attorneys’ fees.
In both cases the questions of liability and damages were tried separately pursuant to Buie 39 (a) of this court.
In the first stage of the Alcea case the attorneys were faced with the problem of establishing the right of certain plaintiff tribes to recover compensation for certain lands on the coast of Oregon to which those tribes, who were parties to an unratified treaty dated August 11, 1855, claimed they had original Indian title through exclusive possession and occupancy from time immemorial, which.lands were taken in 1855 and subsequently by the United States without payment of just compensation. There was also the problem of establishing the extent of the land so claimed, and the fact of the use and occupancy. Following a judgment in favor of these plaintiffs,[4] the case was heard by the United States Supreme Court upon a writ of certiorari, and the judgment of this court was affirmed after argument and reargument, on November 25, 1946 (329 U. S. 40). Proof of immemorial possession and the extent of the land so possessed necessitated extensive and detailed research for several years by *176 counsel for plaintiffs, together with the taking of testimony and the production of exhibits before Commissioners of this court.
The second stage of the Alcea case, involving the question of damages, necessitated further research by experts into the probable value of nearly three million acres of land in 1855. Reports were prepared and introduced in evidence relative to the timber lands, mineral lands, agricultural lands, towns, coastal facilities, and trade and commerce in the area, along with an analysis of contemporaneous land sales, private and public. Following a judgment by this court in favor of plaintiffs,[5] awarding approximately $1.20 per acre for the land taken, together with an additional amount measured by interest to make just compensation, the United States Supreme Court, on defendant’s petition for a writ of certiorari, reversed the judgment of this court in the matter of interest in a decision dated April 9, 1951.[6] Extensive briefs, proposed findings of fact and other documents were prepared by the attorneys during both phases of the case. A considerable portion of eleven years has been devoted by the attorneys to this litigation. Their records disclose that approximately 1,46314 days were spent by the attorneys on this case.
In the first stage of the Rogue River case, the attorneys were required to show that plaintiffs had acquired a title interest in certain lands which the Government allegedly became obligated, under the terms of various treaties, to grant or cede to plaintiffs as permanent reservations; that the Government subsequently wrongfully deprived plaintiffs of a portion of these lands and failed to meet agreed payments' for the surrender of certain rights by plaintiffs. This phase of the case resulted in a holding that certain of the plaintiffs were entitled to recovery,[7] and judgment was reserved for further proceedings to determine the amount of recovery and the amount of offsets, if any.
The case was then tried to determine the extent and value of the lands taken from the Confederated Bands of the *177 Umpqua Tribe and the Calapooias residing in the Umpqua Valley, and the' fact of their occupancy. As a result, net judgments were entered for the Moléis and the Umpqua Valley Indians. The problems encountered in the proof were similar to the problems inherent in the Alcea case. Extensive briefs, proposed findings of fast and other documents were filed by the attorneys, who spent 593 days in the conduct of this case.
In view of the time involved, the difficulty and novelty of the numerous issues, and the fidelity of the attorneys to the interests of their clients,[8] we believe that a fee measured at the rate of 10 percent of the judgments in the two cases is fair and reasonable. In the Alcea case, the attorneys’ fee shall be $225,998.69. In the Rogue River case, the attorneys’ fee will be at the rate of 10 percent of $342,450.74,, the judgment in favor of the Confederated Band of the Umpqua Tribe of Indians and the Calapooias residing in the Umpqua Valley, plus 10 percent of the interest awarded on the principal sum of $67,820[9] from the date of judgment to the date of payment; plus 10 percent of the $34,996.85 judgment in favor of the Molallalas or Molel Tribe of Indians.[10]
CASH ADVANCED BY ATTORNEYS
The attorneys are requesting reimbursement from the judgments, for cash advanced by them as follows:
Case No. 45230:
To cash advanced by Sanders, Gravelle, Whitlock & Howrey-$13,961.16
To cash advanced by John G. Mullen_ 4, Oil. 89
To cash advanced by E. L. Crawford_ 2,741. 56
Total_ 20,714.16
*178 Case No. 45231:
To cash advanced by Sanders, Gravelle, Whitlock & Howrey_ $3,806.94
To cash advanced by John G. Mullen_ 556.89
To cash advanced by E. L. Crawford- 425.39
Total_^- 4,789.22
The above items of expense have been properly itemized and verified by the attorneys and include the usual and necessary expenses encountered in this type of litigation such as travel expense, printing and stenographic costs, telegraph and telephone charges, cost of photostating maps and documents, purchase of pamphlets and maps and various publications, etc.
An examination of the vouchers and statements submitted by the attorneys indicates that the cash was advanced for necessary and proper expenses, and the Department of Justice has indicated that it considers the items of expense to be reasonable and proper.
However, the Government has interposed an objection to the award of any amount as reimbursement for the cash so advanced by the attorneys, on the ground that this court lacks jurisdiction to decree necessary and proper expenses, and further, that the attorneys’ contracts with the plaintiffs require that such expenses be verified and approved by the Secretary of the Interior.
As to the Government’s first contention, the jurisdictional act, in Section 3 quoted above, clearly imposes upon this court the duty of decreeing “all necessary and proper expenditures incurred in the preparation and prosecution of the suit or suits.”
- As to the second contention, Contract No. 12606, applicable to the successful plaintiff Indians in the Alcea case, provides that expenditures made by the attorneys “shall be itemized and verified by the parties of the second part [the attorneys], and shall be accompanied by proper vouchers, and shall be paid only upon the approval of the Secretary of the Interior, or officer designated by him.” , There was no possibility of the attorneys’ expenses being paid currently during the course of the litigation as the Alcea Band had no funds to their credit. Accordingly, following the entry of *179 the final judgments in tbe case, the Department of Justice submitted to the Secretary of the Interior the attorneys’ motion to fix attorneys’ fees and for reimbursement for cash advanced, for his approval. In response, the Solicitor for the Department of the Interior wrote to the Attorney General, in part, as follows:
_ As this Department has not participated in the litigation on the merits, it has insufficient information to make possible the proper evaluation of the attorneys’ services. The attorneys in your Department who are familiar with all the details of the litigation are believed to be in a far better position to formulate a recommendation for presentation to the court with respect to the fees to be allowed to the attorneys for the plaintiffs, and this Department will defer to their judgment.
We have here, then, the somewhat anomalous situation where the enabling legislation requires this court to approve the necessary and proper expenses of attorneys; the contract entered into pursuant to such legislation requires the approval of such expenses by the Secretary of the Interior or by an “officer designated by him”, and the Secretary, through his Solicitor, has apparently designated the defendant in the litigation to pass on the matter. We do not know what efforts, aside from the Attorney General’s letter of June 11, 1951, to the Department of the Interior, have been made to secure the approval of the Secretary of the Interior. Inasmuch as the Department of Justice has interposed no objections to the items of expense and has, in fact, conceded that they are reasonable and proper, and since we find them to be necessary and proper, we do not believe that the failure of the Secretary of the Interior to exercise his power of approval or disapproval under the contract should operate to defeat the attorneys’ right to reimbursement for cash advanced for such necessary and proper expenses. Accordingly, having, found such expenses to have been necessary and proper, we decree .that the attorneys shall be reimbursed therefor from the judgments in the Alcea case.
In the Bogue River case, the applicable contract (No. 17480) does not contain the provision requiring the approval of expense items by the Secretary of the Interior. We find that such expenses were necessary and proper and decree *180 tbat the attorneys shall be reimbursed therefor out of the judgments in the Bogue River case.
FIXING OP COMPENSATION POR EXPERT SERVICES
The attorneys have requested the court to fix the compensation for the expert services rendered by Messrs. E. O. Fuller, C. Weldon Kline, and George B. Wasson, and to decree the payment of such compensation' out of the judgments in the two cases.
The Government contends that this court lacks jurisdiction of the claims for compensation for expert witnesses because the jurisdictional act authorizes the court to fix the fees of the attorneys only, and also because the attorneys’ contracts with the plaintiff Indians require all expenses to be verified and approved by the Secretary of the Interior.
As to the Government’s first contention, the employment of expert witnesses is a legitimate expense necessarily' incurred in the preparation and prosecution of cases such as these, and the jurisdictional act applicable to these cases gives this court the power to determine the reasonableness of such an expense and to decree payment thereof out of the judgment.
As to the Government’s second contention, thé applicable contract in the Rogue River case does not require the approval of the Secretary of the Interior of any expenses. As to the effect of the provision in the Alcea contract requiring the approval of the Secretary for the payment of expenses, our comments with regard to the other expense items above are applicable here, and the failure of the Secretary of the Interior to act or to make an appropriate designation, will not prevent the payment of reasonable compensation tó expert witnesses retained by the attorneys for the proper presentation and proof of the cases.
Next, the Government says that the allowance of the claims of Fuller and Kline would be against public policy because of the contingent nature of their fee arrangements in the contracts of employment between them and the attorneys. The contracts with Fuller and with Kline provided in general for the payment by the attorneys to the experts of .sums *181 to cover actual out-of-pocket expenses incurred by the experts. The contracts then provided that in the event of a judgment or judgments in favor of the plaintiff Indians, application would be made to the Court of Claims for an award, out of the judgments, of such fees as the court might deem reasonable and proper. In view of the fact that none of the plaintiffs had any funds available for the payment of the expenses of the litigations, the arrangements made by the attorneys for the payment of the experts would seem to be the only possible one that could have been made. It would seem to us unreasonable to expect the attorneys to advance more than the actual expenses of those witnesses, and the stipulation that this court should fix their final fee was, we think, entirely proper under the circumstances of these cases.
Finally, the Government contends that the fees sought by Fuller and Kline are grossly excessive. There appears to be a good deal of merit to this contention.
Mr. Fuller was retained by the attorneys to make an appraisal of the land (except for mineral land) in both the Alcea[11] and the Bogue River[12] cases. His appraisals which were painstaking, elaborate and very helpful in determining the value of the lands, were contained in carefully prepared reports which were introduced in evidence in each case. The report in the Alcea case contained 199 pages and 81 appendices. His services, including the time spent in testifying orally, consumed 276 days. Pursuant to his contract with the attorneys, Mr. Fuller was paid per diem and additional amounts to cover out-of-pocket expenses, in the total amount of $1,745.17.
Mr. Fuller is requesting the court to set his fee for services at $65,000. In justification of this amount, Mr. Fuller points out that he has been employed by attorneys for Indians in six other successful litigations; that in the Shoshone case (85 C. Cls. 331) this court awarded him $15,000 for his appraisal of 2,343,540 acres of land; that the appraisers in the TJte litigation were paid by the attorneys for the Utes *182 $116,000 for their appraisal of 4,480,000 acres of land;[13] that the Government paid Dr. A. F. Yass, an expert in the TJte case, $35 per day for his services in Laramie, and $50 per day for his services outside of Laramie; that the appraisal in the Alcea case involved valuing land in 1855 whereas in the TJte case, the values to be arrived at were as of 1938.
Mr. Fuller’s requested fee of $65,000, over and above expenses which have already been paid to him, would result in a daily fee of $235.50, or an hourly fee (based on a 6-hour day) of $39.25. We know of no precedent for the awarding of such a fee to an expert in Indian litigation. Under all the circumstances, we find a fee of $15,000 for Mr. Fuller’s services as an expert in the Alcea litigation to be entirely adequate and proper.
Mr. Fuller’s services in the Bogue Bi/oer case were similar to his services in the Alcea case, and in general consisted of preparing an appraisal and report covering approximately 67,800 acres of land. The report consisted of 118 pages with 16 appendices, and the time consumed in the preparation of the report and testifying was 132 days. For his services in the Bogue Biver cáse, Mr. Fuller is requesting a fee of $5,000 over and above $915.15 already paid him as expenses by the attorneys. The $5,000 fee requested would result in a daily fee of approximately $37.87, which is considerably less than the rate he seeks in the Alcea case. The acreage involved in the Bogue Biver case was substantially smaller than the acreage in the Alcea case, and the problems inherent in the Bogue Bvoer appraisal were considerably less numerous and complex. On the whole, we believe -that a fee of $2,500 for Mr. Fuller’s expert services in the Bogue Bj/oer case is reasonable and proper.
Mr. C. Weldon Kline was retained by the attorneys' to make an appraisal of the timber on the land involved in the Alcea case. He cruised the timber on the whole tract and computed the value of the different types of timber, as of *183 the time of his survey. After making up numerous tables and charts, and after considerable. research, he was able to compute the approximate amount of timber standing on the tract and its value (by species) as of 1855. His appraisal was contained in an 84-page report which was received in evidence. His testimony covered some 147 pages, and the time consumed in making the appraisal and testifying was 141 days. For these services, Mr. Kline is requesting a fee of $25,000, over and above the $2,570.50 paid him for his expenses by the attorneys. (His contract called for the payment to him by the attorneys of $500 per month expense money.) The fee requested by. Mr. Kline would result in a daily rate of $177.30.
Mr. Kline’s work was of a very high caliber and his report was of great value to the plaintiffs. We are of the opinion that an award of $7,000 for his services in the Alcea case is just and proper.
The attorneys have submitted a claim by the estate of George Bundy Wasson for fees for expert services rendered in connection with each case. . The claim is for $12,000 in the Alcea case, and $3,000 in the Rogue River case. Mr. Wasson' did not have a contract with the Indians nor with the attorneys. He did not appear as a witness and he did not submit reports or other material used in evidence. He was related by blood to one of the tribes which was not successful in this litigation. From 1929 .to the date of his death on August 2, 1947, he devoted considerable time and effort on behalf of the claims of the various tribes of Oregon Indians and .was largely instrumental in the securing of the jurisdictional act under which these suits were brought. Following the passage of the jurisdictional act he arranged tribal meetings for the purpose of negotiating employment contracts with' the attorneys, and later for the purpose of extending those contracts. After the filing of the .petitions in this court, Mr. Wasson conferred on numerous occasions with plaintiffs’ counsel, Mr.,Mullen and Mr. Crawford; he arranged for the presence of witnesses in Toledo, Oregon, whose depositions were taken on the question of immemorial possession and other matters in the Alcea case; he was very *184 familiar with all the country in controversy, with the language and customs of the tribes, with the history and background of the Oregon Indians and of Oregon itself; he acted as a guide for Mr. Fuller on his trips through the land in question; he was actually accompanying Dr. Smith, the minerals expert, on a field trip at the time of his (Mr. Wasson’s) death. From the affidavits filed on his behalf by the attorneys and the experts, it appears that Mr. Was-son spent well over two years’ actual time on matters relating to these cases and that his services were of great value to both the Indians and the attorneys. Mr. Wasson apparently paid his own expenses on his many trips around Oregon and also on his trips to Washington, D. C. There is no evidence of record that he ever requested or even expected to be compensated for his services, which he appears to have voluntarily contributed for the benefit of the Oregon Indians. His services more nearly resemble those of an associate of the attorneys than those of an expert witness. Whateyer his services, and however valuable, there seems to be no basis upon which this court would be justified in awarding, his estate a fee out of the judgments in these cases. As far as we are able to determine from the record before us, his services were in the nature of a very valuable but voluntary contribution to a cause about which he felt deeply. The successful plaintiff Indians are, of course, at liberty to secure the appropriate permission to reward Mr. Wasson’s estate in any manner they see fit; or the attorneys may make any adjustment they deem justified out of the fee allotted to them. This court, however, is without the power to make any award to Mr. Wasson’s estate for his services.
Accordingly, it is ordered, adjudged and decreed as follows:
That pursuant to Section 3 of the Jurisdictional Act of August 26, 1935 (49 Stat. 801), the reasonable fees to be paid to the attorneys for the plaintiff tribes of Indians in Case No. 45230 and Case No. 45231, are, and the same hereby are affixed, determined and allowed as follows:
*185 Out of the judgments rendered in Oase 'No. J¡52S0 Plaintiffs Tillamooks.... Coquille. Tootootoney.. Ohetco. Amount of judgment Attorneys" fees Percent Amount of fee $980,497.95 625,481.88 320,781.26 353,225.81 $96,049.80 62,548.19 32,078.13 35,322.58 Out of the judgments rendered in Case No. Plaintiffs Amount of judgment Attorneys’ fees Percent Amount of Molel or Molallalas. Confederated bands of the Umpqua Tribe and the Calapooias residing in the Umpqua Valley. Additional amount measured by interest at 4 percent per annum on $67,820 from date of judgment (April 3, 1950) to date of payment (November 19,1951)[14]_ $34,996.85 342,450.74 4,422.24 $3,499.69 34,245.07 442.22
It appears to the court that the several attorneys for plaintiffs have an agreement as to the division among themselves of the fees so allowed by the court in the above cases.
That pursuant to Section 8 of the Jurisdictional Act of August 26, 1935, the further sums are hereby fixed, determined and allowed for necessary and proper expenses paid by the attorneys in the preparation and prosecution of Case No. 45230 and Case No. 45231, as follows:

*186 Case No. 45281[15] To— From— Amount E. O. Fuller.. Sanders, Gravelle, Whitlock & Howrey. John G. Mullen. E. L. Crawford . Umpqua-. Molel_ Umpqua.. $2,600.00 66.26 3,751.68 Total. 3,806.94 Molel_ Umpqua.. Total. Umpqua.... 7.88 549.01 656.89 425.39
That pursuant to Section 3 of the Jurisdictional Act of August 26,1935, there shall be paid as necessary and proper expenses incurred in the preparation and prosecution of the suits, the following amounts to the persons named hereinafter, in full compensation for services rendered by them as expert appraisers and witnesses in the two cases:

The motions in both cases, insofar as they relate to claims submitted on behalf of the Estate of George Bundy Wasson, are dismissed.
It is so ordered.

 119 C. Cls. 835.

 116 C. Cls. 454.

 Act of August 26, 1935, Public 332, 49 Stat. 891.

 103 C. Cls. 494.

 115 C. Cls. 463.

 341 U. S. 48.

 105 C. Cls. 495 (February 4, 1946).

 As noted hereinafter, the plaintiffs in the two suits had no funds on deposit with the united States Treasury and the attorneys represented their clients on a purely contingent basis both as to fees and expenses.

 Interest at the rate of 4 percent per annum was awarded on this principal amount, from the date of judgment to the date of payment thereof.

 The judgment in favor of the Molel Tribe did not carry interest.

 The acreage involved was 2,772,580 acres.

 The acreage involved was 67,820 acres.

 Mr. Fuller concedes that out of that fee all the expenses of the firm of appraisers in connection with the appraisal had to be paid; it also appears that the appraisal in the TJte case was carried out by several persons.

 It is the understanding of the court that for purposes of payment of the Umpqua judgment the General Accounting Office has computed the interest due therein to November 19,1951, in the amount of $4,422.24, which makes the total payment as of that date on the Umpqua judgment $346,872.98. The attorneys’ fees and expenses decreed and allowed herein in the Bogue Biver case accordingly are apportioned between the Molel and Umpqua judgments as of that date.

 Inasmuch as the Molels were not involved in the second phase of the Rogue Fiver case except for a stipulation of the amount of offset, only the expenses incurred prior to February 4,1946, which marked the conclusion of the first phase of the case, are apportioned. All of tne Rogue Fiver expenses thereafter, which include Mr. Fuller's fee as an expert, are allocated to the Umpqua judgment only.