The NAVAJO TRIBE OF INDIANS

v.

The UNITED STATES.

Nos. 69, 299 and 353.

United States Court of Claims.

May 28, 1980.

William C. Schaab, Albuquerque, N.M., attorney of record, for plaintiff. Paul D. Barber, Albuquerque, N.M. and Sarah W. Barlow, Albuquerque, N.M., of counsel.

Dean K. Dunsmore, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant. Marvin E. Schneck, A. Donald Mileur, George R. Hyde and Glen R. Goodsell, Washington, D. C., of counsel.

Charles A. Hobbs, Washington, D. C., for The Three Affiliated Tribes of The Fort Berthold Reservation, Angelo A. Iadarola, Washington, D. C., for the Nez Perce Tribe of the Nez Perce Reservation, Jerry C. Straus, Washington, D. C., for the Blackfeet and Fort Belknap Reservations, and Frances L. Horn, Washington, D. C., for the Shoshone-Bannock Tribes of the Fort Hall Reservation, amici curiae. Wilkinson, Cragun & Barker, Patricia L. Brown and Robin A. Friedman, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

## ON REQUESTS FOR REVIEW OF
## TRIAL JUDGE'S OPINION

DAVIS, Judge:

Perhaps the most complex and troublesome of the remaining litigations under the Indian Claims Commission Act are the accounting claims of the Navajo Tribe (Nos. 69, 299 and 353). Since the transfer of those cases to us from the Commission in December 1976, the court has already passed five times upon separate aspects of one or another of the claims.[1] The present appeal concerns another very large chunk of those accounting problems.

The matrix of the case, as it comes to us, consists of a series of six accounting reports filed by the Government in 1953, 1958, 1959, and 1961 with respect to these accounting claims—mainly in docket No. 69. With the permission of the Commission, the Tribe filed, successively, numerous exceptions to these reports. The exceptions now before us are the supplementary exceptions. The Government then filed a motion to dismiss most of these supplementary exceptions (or to strike or for a more definite statement), giving its reasons in 145 separate parts of its motion.[2] Trial Judge Bernhardt has laboriously and carefully considered all aspects of this motion in an opinion (filed September 19, 1978) of some 188 pages

which is now before us on requests for review by both sides.[3]

I

Our first task is to clear the field—to separate out the items which we should review at this time from those interlocutory rulings which are not appropriate for present appellate consideration but should be left for review (to the extent the issues survive) at the final conclusion of the Trial Division's determination. In *Navajo Tribe, supra*, 220 Ct.Cl. at ——, 597 F.2d at 1365–66 (1979), the court decided that it would automatically review, as of right, decisions of the Trial Division on dispositive motions in transferred Indian cases. The corollary of that ruling is that interlocutory, procedural rulings of the trial judges are not to be reviewed as of right unless certified by the trial judge under Rule 53(c)(2)(i). In the absence of certification, such procedural rulings will not be reviewed on an interlocutory basis unless the strict conditions of Rule 53(c)(2)(ii) are satisfied.[4] Those are the provisions for interlocutory review which govern all non-appeal cases being handled in this court by a trial judge. No exception exists for Indian cases or, more specifically, for Indian accounting cases.[5]

1. *Navajo Tribe v. United States*, 218 Ct.Cl. ——, 586 F.2d 192 (Oct.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979); *Navajo Tribe v. United States*, 220 Ct.Cl. ——, 597 F.2d 1362 (April 1979); *Navajo Tribe v. United States*, 220 Ct.Cl. ——, 597 F.2d 1367 (April 1979); *Navajo Tribe v. United States*, 220 Ct.Cl. ——, 601 F.2d 536 (June 1979), *cert. denied*, Feb. 19, 1980; *Navajo Tribe v. United States*, 222 Ct.Cl. ——, 610 F.2d 766 (Dec.1979).

2. The trial judge tells us that the exceptions and motion briefs before him aggregated 739 pages.

3. The trial judge's opinion of September 19, 1978 (now on review) does not cover a number of additional accounting reports filed by the Government in June 1975 and later.

4. These standards are as follows: "[U]pon a showing of extraordinary circumstances whereby further proceedings pursuant to the said order [or ruling] would irreparably injure the complaining party or occasion a manifest waste of the resources of the court or of the

parties. In general, the policy of the court is that proceedings before trial judges will not be interrupted by appeals to the court for piecemeal determinations, and the court will deal with the entire case or a properly severed aspect thereof, on a single occasion only. The mere fact that deferring correction of the trial judge's alleged error to the court's review of the trial judge's final decision may lead to a remand for a new trial, or for the taking of further evidence, or for reconsideration by the trial judge, or may cause delay in the ultimate disposition of the case, will not be deemed, by itself, to satisfy the standards of subdivision (ii)."

5. The rule that dispositive motions or decisions come automatically to the court does not encompass any sub-rule that interlocutory matters (on *other* subjects or claims) which happen to be included in the same opinion become reviewable as of right simply because they are made in the same opinion as a dispositive ruling on a separate subject or claim.

In our view, most of the trial judge's rulings now brought before us fall into the category of interlocutory procedural decisions which do not merit prompt or immediate review under Rule 53(c)(2)(ii).[6] On the Government's appeal, many of the challenged rulings deal with such routine procedural, non-dispositive matters as (a) the need for a more definite statement of a plaintiff's exception, (b) the necessity to cite specific statutes as the basis for an exception, (c) citation of irrelevant or incorrect statutes in an exception, (d) whether later filings or submissions by the defendant, or actions of the trial judge or the court, have mooted or answered an exception by the plaintiff, (e) whether plaintiff or defendant has better access to certain information or records, (f) whether the Government should hand over or make available to the Tribe certain records, documents, or materials, (g) how far the Government must go in explaining to plaintiff its handling of tribal funds or property, (h) deferral of decision by the trial judge until further clarification by the parties or until a later stage in the proceedings,[7] (i) whether certain issues are more appropriately considered in later or separate proceedings, (j) denial by the trial judge of parts of the defendant's motion to dismiss an exception without prejudice to the Government's later renewal of the same issue, (k) claims by the Government that plaintiffs have split a single cause of action, (*l*) consolidation of various claims, and (m) rulings on plaintiff's motion to renew interrogatories. In addition, the defendant complains of several statements in the trial judge's opinion which are obviously dicta or preliminary observations rather than firm holdings. We include in the same class of interlocutory rulings holdings that the facts are not clear or developed enough to permit a proper disposition of the exception at this time.

For its part, plaintiff raises such comparable procedural, non-dispositive issues as (a) whether the citation in an exception of certain legislation is exclusive or illustrative; (b) the amount and detail of government information to which the Tribe is entitled; (c) the amount of specification which may be required of plaintiff at the exception stage of the accounting proceeding; (d) deferral of rulings by the trial judge until a later stage of the proceedings; and (e) rulings (or failures to rule) on burden of proof and the burden of going forward with the evidence. Like the Government, the Tribe also challenges some plain dicta in the trial judge's opinion.

We see no adequate reason why we should pass at this time on procedural or non-dispositive rulings of this type. They are truly interlocutory, subject to the trial judge's discretion, and may "wash out" in the course of the further proceedings. Nor do they meet our normal standards for immediate, interlocutory review (as described above). If we were to review, as of right, such rulings or statements in Indian accounting cases, we would be undertaking an enormous, perhaps impossible, burden—as this case demonstrates conclusively—without concomitant benefit to the proceedings or the litigation. We would also be prolonging these Indian accountings by all the months needed for the submission, argument, and decision of numerous interlocutory appeals.

Accordingly, we decline now to consider or rule upon all parts of Trial Judge Bernhardt's decision except those portions specifically mentioned and considered in the ensuing discussion (Parts III–X of this opinion). The group of rulings which we shall not consider includes, as well, the segments of the trial judge's opinion to which neither party has excepted, and in addition certain

---

6. The trial judge has certified none of the rulings for review, possibly because he considered that they would be reviewed as of right by the court.

7. For instance, the trial judge deferred decision on issues which he thought would be controlled by decisions of the court in cases not yet argued or decided by us at the time he rendered his decision—particularly the *Navajo Tribe* case, *supra*, 218 Ct.Cl. ——, 586 F.2d 192, involving the coverage of the Indian Claims Commission Act of "continuing wrongs" occurring after August 1946.

procedural questions with dispositive facets or overtones which we deem unworthy of separate consideration at this stage.

In declining to consider these parts of the trial judge's opinion, we do not adopt or refuse to adopt them. More than that, we neither approve nor reject them, nor intimate any view as to their contents or merits. The trial judge is free to reconsider them or to change them as he deems appropriate in view of later decisions, later occurrences in the litigation, or changes in his position.

## II

■ Profiting from the unfortunate experience on these Navajo accounting claims, we direct that in the future the Trial Division, once a plaintiff has filed exceptions to an accounting, should not mechanically allow the defendant to file motions to dismiss or to strike, or for a more definite statement, etc. Instead, in Indian accounting cases the trial judge should decide in each instance—perhaps after a pretrial conference—(a) which issues raised by exception should be sent directly to trial, (b) as to which issues the parties (or one party) should be directed or permitted to file motions for summary judgment (or motions to dismiss) which can be decided separately from the trial,[8] (c) which issues should be clarified by further filings or submissions by plaintiff or defendant (including the filing of an answer to the exception) before those issues are set for trial or scheduled for disposition by dispositive motion, and (d) if a motion to dismiss or for summary judgment is allowed to be filed, whether the

trial judge or the court should initially decide that dispositive motion.

■ The objective should always be to conclude the litigation as speedily and simply as feasible, without needless or burdensome steps or complications. *See* Part IV of *Navajo Tribe, supra,* 220 Ct.Cl. at ——, ——, 601 F.2d at 540 (1979); *Temoak Band of Western Shoshone Indians v. United States,* 219 Ct.Cl. ——, ——, 593 F.2d 994, 998–99 (1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). As Chief Judge Friedman said in *Navajo Tribe, supra*: "There is a need for innovative handling and treatment, perhaps to devise new procedures that will end the delays that have plagued these cases for so many years. We have faith in the ability of the trial judges to develop such techniques." 220 Ct.Cl. at ——, 601 F.2d at 540.

■ There is a cognate problem to which we must also refer. In these Navajo cases, the trial judge commented unfavorably on the continuous flow of exceptions and supplemental exceptions from the plaintiff, and ruled that the supplemental exceptions then before him "must be the last." We confirm and emphasize that holding.[9] There must be an end to the filing of exceptions to the existing accounting reports in these Navajo cases, and in other Indian accounting cases there should not be allowed the successive filings of exceptions to the same reports which have been permitted in the present cases.[10]

## III

Before we consider those portions of the trial judge's opinion which we shall review,

---

8. It is open to the trial judge to decide, in his discretion, that even though an issue is technically or substantively eligible for disposition by summary judgment or motion to dismiss, it should nevertheless be included in the issues to be tried in the accounting trial.

9. The Commission allowed the plaintiff to file the supplementary exceptions which are the foundation of the trial judge's opinion now before us. Though the defendant renews its objection to the allowance of that filing, we consider it too late in the day, and inappropriate at this time, to go back on, or reverse, the Commission's order permitting the filing.

10. As Trial Judge Bernhardt pointed out: "It has been 17 years since the filing of the 1961 [Accounting] Report at which the present supplemental exceptions are aimed. The grist of the supplemental exceptions could have been filed at the time the original exceptions were filed in 1970, and for the most part (so far as we can determine from a cursory comparison) relate to new matters not raised before. Advent of new counsel may explain, but does not extenuate, endless second thoughts as to deficiencies of the 1961 Report."

we deal with a separate contention raised by both sides at the oral argument. After the trial judge's opinion was issued, the court decided that claims 1 through 6 and claim 8 in docket No. 69 should be dismissed as barred by limitations. *Navajo Tribe, supra*, 220 Ct.Cl. at ——, 601 F.2d at 539–40. In its order denying rehearing of that decision (Sept. 28, 1979), the court ruled that the dismissed claims could not be asserted as part of claim 7 in docket No. 69—the general accounting claim now before us.

At the argument government counsel urged repeatedly that many of plaintiff's exceptions under claim 7 involved the same subject matter or claims as did the dismissed claims and were therefore precluded, under the order of September 28, 1979, from inclusion in general accounting claim 7.

We think that in the breadth of its approach defendant has misconstrued the September 28th order. That order was not meant to delete any true accounting claims already included in claim 7—an all-inclusive claim that asked the Government to account generally and properly for its handling of the Tribe's monies or property over which the Government had exercised control or supervision—simply because the specific item happens to deal with the same general subject matter (*e. g.* land, oil, gas or education) as a dismissed claim. What the September 28th order did, and was meant to do, was to prevent plaintiff from attempting to restate and reinvigorate the dismissed claims, which were *not* accounting claims, in the form (if not the substance) of accounting claims in order to try to bring them now, for the first time, under claim 7. But true accounting claims, involving the disposition of tribal funds and property, have always been warp and woof of claim 7, and they remain so. If the issue is whether the Government, as fiduciary, faithfully managed or used Navajo assets, claim 7 covers the question.

For instance, one of the dismissed claims was that the Government failed to provide educational and other services to the Nava-jos. The dismissal of that claim does not prevent the plaintiff from urging that defendant must account for the use and disposition of educational monies appropriated by Congress to or for the use of the Navajos specifically; the latter aspect is and has always been fully a part of the general accounting claim we are now considering. On the other hand, the broader contention that the United States failed, apart from the obligations of the 1868 treaty, to appropriate or make available sufficient funds to educate the Navajos to the proper level and in the proper fashion—a contention also apparently contained in the dismissed claim—could not now be restated or included under claim 7.

■ On this issue of the dismissal of claims 1–6 and 8, the Tribe takes a converse position which we also reject. It says that claim 7 is not merely a true accounting claim, that it likewise covers any "fair and honorable dealings" claim tied to a subject mentioned in the petition—whether or not that "fair and honorable dealings" claim involves federal management of Navajo property or funds. On this basis, plaintiff urges that the dismissed claims 1–6 and 8 can all fall squarely within claim 7. This interpretation of claim 7, however, is obviously contrary to our decision of June 1979 in *Navajo Tribe, supra*, and to the rehearing order of September 28, 1979. More than that, the Tribe's argument stretches claim 7 far beyond its proper accounting confines. That claim has always been treated and considered as purely an accounting claim, and we think that it must be restricted to that compass. "Fair and honorable dealing" claims, not involving the Government's management and use of Navajo assets, do not come at all under claim 7.

IV

■ On the Government's request for review, we take up first defendant's challenge to the trial judge's general discussion (in Part I of his opinion) of the fiduciary relationship between the United States and the

Indians.[11] Defendant contends that no fiduciary obligation can arise unless there is an *express* provision of a treaty, agreement, executive order or statute creating such a trust relationship, and the trust relationship is limited by the precise terms of the document. If by this the Government means that the document has to say in specific terms that a trust or fiduciary relationship exists or is created, we cannot agree. The existence *vel non* of the relationship can be inferred from the nature of the transaction or activity.

■ In particular, where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection. *See Seminole Nation v. United States*, 316 U.S. 286, 296–300, 62 S.Ct. 1049, 1054, 1056, 86 L.Ed. 1480 (1942); *Menominee Tribe of Indians v. United States*, 101 Ct.Cl. 10, 18–20 (1944); *Menominee Tribe of Indians v. United States*, 102 Ct.Cl. 555, 562 (1945); *Navajo Tribe v. United States*, 176 Ct.Cl. 502, 507, 364 F.2d 320, 322 (1966); *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 345, 512 F.2d 1390, 1392 (1975); *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 152–54, 550 F.2d 639, 652–53 (1977). In *Menominee Tribe, supra*, we held explicitly that a special jurisdictional statute making ordinary fiduciary standards applicable to the United States, "add[s] little to the settled doctrine that the United States, *as regards its dealings with the property of the Indians*, is a trustee." (emphasis added). 101 Ct.Cl. at 19. Likewise, *Navajo Tribe, supra*, 176 Ct.Cl. at 507, 364 F.2d at 322, observed that "[n]umerous cases have expressed the notion that, *when dealing with Indian property*, the Government may be acting as a 'trustee.'" (emphasis added).

The same principle—that for Indian tribal property there need not be express designation of special status—is reflected in other opinions. In *Cramer v. United States*, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923), the Supreme Court voided a federal land patent which had granted Indian-occupied lands to a railway. Relying heavily on the trust relationship with the Indians, and the national policy protecting Indian land occupancy, the Court found that the general statutory authority of federal officials to issue land patents was limited, even though Indian occupancy of the lands was not expressly protected by treaty, executive order, or statute. *Id.* at 227–29, 43 S.Ct. at 344. The Court stated that "[t]he fact that such [Indian] right of occupancy finds no recognition in any statute or other formal Governmental action is not conclusive." *Id.* at 229, 43 S.Ct. at 344. *See also, Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113, 39 S.Ct. 185, 186, 63 L.Ed. 504 (1919) (even in the absence of a treaty or statute protecting Indian lands from sale by the Government, the court could enjoin the Government from treating Indian lands as public lands and disposing of them under public land laws); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1245–46 (N.D.Cal.1973) (the duty to make trust property income productive arises from the trust relationship between an Indian tribe and the United States; it exists even in the absence of a specific statute). *Cf. Pyramid Lake Paiute Tribe of Indians v. United States*, 354 F.Supp. 252, 257 (D.D.C. 1973), *rev'd on other grds.*, 499 F.2d 1095 (D.C.Cir.1974) (although no treaty or statute was violated by the Government's actions relating to the diversion of water from an Indian reservation to a federal dam and reclamation project, the Government was enjoined from proceeding with the diversion because the diversion would be in violation of the Government's trust responsibility to the tribe).

11. Though this issue does not arise in the context of a dispositive ruling (in Part I of the trial judge's opinion) we consider it now because we view it as a seminal question for all of the further proceedings in this accounting and in other Claims Commission Act accountings.

On the other hand, if no tribal money or property is involved and the question is, for instance, whether the United States has a general fiduciary obligation to educate Indians, the existence of the special relationship for that purpose depends upon the proper interpretation of the terms of some authorizing document (*e. g.* statute, treaty, executive order). *Gila River Pima-Maricopa Indian Community v. United States*, 190 Ct.Cl. 790, 797–98, 427 F.2d 1194, 1198, *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970).

■ The present accounting claims all deal with the management and disposition of Navajo funds and property. Defendant's insistence on express or statutory terms of trust is therefore irrelevant to these claims. Nor is the court required to find all the fiduciary obligations it may enforce within the express terms of an authorizing statute (or other document). The general law of fiduciary relationships can be utilized to the extent appropriate. *Cf.* cases cited above and *Duncan v. United States*, 220 Ct.Cl. ——, 597 F.2d 1337, 1346 (1979), remanded by Sup.Ct. for reconsideration, April 21, 1980, and *see* Part V of this opinion *infra.* This does not mean, however, that all the rules governing the relationship between private fiduciaries and their beneficiaries and accountings between them necessarily apply in full vigor in an accounting claim by an Indian tribe against the United States. We refer to such rules as the principle that once a breach of fiduciary duty is merely charged (without any supporting material), the beneficiary is entitled to recover unless the fiduciary affirmatively establishes that it properly discharged its trust, and the theory that failure to render the precise form of accounting required may be sufficient, in and of itself, to establish liability. In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in

light of the relationships between the Government and the particular tribe.

Accordingly, we reject defendant's appeal on this point, and affirm, in general, the trial judge's position on the application of the fiduciary relationship to these accounting claims.

## V

Our holding in Part IV, *supra*, of this opinion leads us directly to affirmation of the trial judge's ruling rejecting defendant's motion to dismiss plaintiff's supplemental exception li (Part XIX of the trial judge's opinion). That exception states that the accounting report prepared in 1961 on the Navajo Tribe fails to account for sales of fire-damaged timber on tribal lands pursuant to the Act of March 4, 1913, ch. 165, 37 Stat. 1015, 1016. The act authorized the Secretary of the Interior to sell fire-damaged timber located on public and ceded Indian lands.

In accord with its general stance (*see* Part IV, *supra*), defendant takes the position that plaintiff is only entitled to an accounting based on a specific statute, treaty, agreement, etc. and that the particular statute relied on by plaintiff in requesting an accounting of sales of fire-damaged timber is inapplicable to these Navajo lands.[12] We need not reach the difficult question of whether the statute cited by plaintiff applies to plaintiff's lands,[13] since, as already indicated, we agree with plaintiff that defendant must account for its handling of plaintiff's timber, even in the absence of a specific statute requiring its sale or fruitful disposition.

The treaty of June 1, 1868, 15 Stat. 667, between the Navajo Tribe and the United States, while it did not specifically speak to plaintiff's timber rights or defendant's responsibilities for them, did create a reservation for plaintiff, in Article II. From the creation of this reservation, certain rights and responsibilities emerged. One of the

---

**12.** Defendant's argument is based on its interpretation of "ceded Indian lands," which defendant contends was not intended to cover plaintiff's lands. *See* 48 Cong.Rec. 9847 (1912).

**13.** The trial judge rejected defendant's interpretation of "ceded Indian lands," and found that plaintiff's reservation lands were covered by the 1913 Act.

rights which plaintiff obtained was the right to timber on its tribal reservation lands. *See Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, 490–91 *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964); *United States v. Shoshone Tribe,* 304 U.S. 111, 116–18, 58 S.Ct. 794, 797, 798, 82 L.Ed. 1213 (1938). Those timber rights are a proper subject for a claim under the Indian Claims Commission Act. *Oneida Tribe, supra,* 165 Ct.Cl. at 490–92.

As we have said, the Government may not avoid its responsibility toward plaintiff's timber by arguing that the 1868 treaty did not expressly create a fiduciary relationship between plaintiff and the United States. *Oneida Tribe, supra,* 165 Ct.Cl. at 492–94. The relationship between defendant and the Indian tribes is a special one, *see* the discussion in Part IV, *supra,* and from it special responsibilities stem where the Government has control and supervision over tribal property. *Oneida Tribe, supra,* 165 Ct.Cl. at 493; *Seminole Nation, supra,* 316 U.S. at 296–97, 62 S.Ct. at 1049–1054, 86 L.Ed. 1480; *Navajo Tribe, supra,* 176 Ct.Cl. at 507, 364 F.2d at 322. This special trust relationship and the responsibilities it creates have been expressly held to extend to tribal timber. *Oneida Tribe, supra,* 165 Ct.Cl. at 493; *Blackfeet & Gros Ventre Tribes v. United States,* 32 Ind.Cl.Comm. 65, 77, 81 (1973), *reh'g denied,* 34 Ind.Cl. Comm. 122 (1974).[14] Moreover, this special or fiduciary relationship has been specifically found to exist between the Government and plaintiff Navajo Tribe with respect to tribal property. *See Navajo Tribe, supra,* 176 Ct.Cl. at 507, 364 F.2d at 322.

Where a trust relationship between the Government and the Indians is established, the Government's actions "must [normally] be judged according to the standard applicable to a trustee engaged in the management of trust property." *Coast Indian Community, supra,* 213 Ct.Cl. at 153, 550 F.2d at 652. A "trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust." Restatement (Second) of Trusts § 172 (1959). *See also, Sioux Tribe of Indians v. United States,* 105 Ct.Cl. 725, 802, 64 F.Supp. 312, 331, *cert. denied,* 337 U.S. 908, 69 S.Ct. 1045, 93 L.Ed. 1720 (1949); *Blackfeet & Gros Ventre Tribes, supra,* 32 Ind.Cl.Comm. at 85. In *Blackfeet,* the Indian Claims Commission specifically found a duty on the Government's part, to account for its efforts to salvage timber damaged by a catastrophic fire. *Id.* at 81.

■ We find therefore that the trust relationship between the Government and the Navajos creates a duty, on the Government's part, to account for its management of plaintiff's timber, including an accounting for proceeds of sales of fire-damaged timber. This duty exists independently of a statute requiring the sale or disposition of such timber. Accordingly, we affirm on this ground the trial judge's ruling denying defendant's motion to dismiss plaintiff's supplemental exception 1i.

VI

Next, we consider defendant's request that we review and reverse the trial judge's ruling denying dismissal of plaintiff's supplemental exception 9 (Part CX of the trial judge's opinion). That exception seeks disallowance of certain disbursements of funds under the June 1, 1868 treaty between the Navajo Tribe and the United States, 15 Stat. 667. Supplemental exception 9 contains ten sections, each of which disputes specific expenditures listed in a report prepared by the General Accounting Office.[15] The challenged disbursements include those

---

14. The defendant's trust obligations toward tribal timber, have been found to be particularly strict, to be established by law, and to require no proof of their existence. *Blackfeet & Gros Ventre Tribes, supra,* 32 Ind.Cl.Comm. at 77, 81.

15. Defendant also seeks review of the trial judge's rulings with respect to certain of these subsections of supplementary exception 9. Except insofar as our discussion in this Part VI or the next Part VII of our opinion may deal with those requests for review, we leave the trial judge's opinion unscrutinized at this time.

which the Tribe alleges were not made for purposes stipulated in the treaty, were for inferior or unsuitable goods, or were not for the benefit of the Navajos. We affirm the trial judge's denial (in Part CX of his opinion) of defendant's motion to dismiss supplementary exception 9.

The disbursements which plaintiff seeks to disallow in this exception were made by the Government in an attempt to fulfill partially its obligations under the 1868 treaty. "In carrying out its treaty obligations with the Indian Tribes, the Government * * * [is] judged by the most exacting fiduciary standards." *Seminole Nation, supra,* 316 U.S. at 296–97, 62 S.Ct. at 1049, 1054, 86 L.Ed. 1480; *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *Navajo Tribe, supra,* 176 Ct.Cl. at 507, 364 F.2d at 322. This fiduciary relationship creates a duty on the part of the United States, as trustee, to account for its performance of treaty obligations. *Sioux Tribe of Indians, supra,* 105 Ct.Cl. at 802, 64 F.Supp. at 331. *Ottawa-Chippewa Tribe v. United States,* 35 Ind.Cl. Comm. 385, 405 (1975); *Blackfeet & Gros Ventre Tribes, supra,* 32 Ind.Cl.Comm. at 85.

Defendant contends nevertheless that plaintiff is entitled only to recover shortages in the 1868 treaty obligations in a breach of contract action, and cannot have an accounting, or recover in an accounting for, those expenditures from the treaty fund which are shown to be improper, so long as total treaty obligations are met. This argument is based on a number of cases in which this court and the Indian Claims Commission stated that the Government's failure to meet treaty provisions is a breach of contractual obligations rather than a breach of trust. *United States v. Mescalero Apache Tribe,* 207 Ct.Cl. 369, 408–09, 518 F.2d 1309, 1333 (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Confederated Salish & Kootenia Tribes v. United States,* 175 Ct.Cl. 451, 454–55, *cert. denied,* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966); *Te-Moak Bands v. United States,* 31 Ind.Cl.Comm. 427, 540–42 (1973). This language occurred, however, in the context of rejection of claims for interest, which was available only on money in trust funds, as opposed to money set aside to fulfill treaty obligations. *See, e. g. Te-Moak, supra,* 31 Ind.Cl.Comm. at 540–42.

In *Ottawa-Chippewa, supra,* the Commission was faced with an argument very similar to that made by defendant in this case. There, the Government argued that it had no duty to account for certain questioned treaty expenditures since plaintiff's claim was for breach of contract rather than equitable accounting. 35 Ind.Cl. Comm. at 404. Defendant relied on *Te-Moak* as its authority. The Commission refused to interpret the language in *Te-Moak,* regarding the treatment of shortages in treaty payments as breaches of contractual obligations, to mean that the United States did not have a duty "to make a fiduciary's accounting for its performance of treaty obligations * * *." *Id.* at 405. In rejecting defendant's argument, the Commission relied on the language in *Seminole Nation,* stating that when it is "carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party." 316 U.S. at 296, 62 S.Ct. at 1054. Rather, the Government's conduct must be judged by high fiduciary standards. *Id.* at 297, 62 S.Ct. at 1054. Contracts such as treaties should be scrutinized to determine whether these fiduciary standards were met. *Ottawa-Chippewa, supra,* 35 Ind.Cl.Comm. at 405. The Commission found that the claim in *Ottawa-Chippewa* for recovery of amounts improperly expended under the applicable treaty was a demand for an accounting, and that no other remedy would be responsive to the claim. *Id.* at 406. We agree with the Commission's analysis in *Ottawa-Chippewa,* and apply it to this case.

Here, as in *Ottawa-Chippewa,* the Tribe has disputed certain disbursements of Navajo funds on the grounds that they were improperly expended, and were not used for the benefit of the Navajos. The

exceptions are related to trust accounting, not only to breach of contract, and we agree with the Commission that a remedy involving a fiduciary accounting is responsive to such claims. In its use of treaty funds, the Government is subject to fiduciary accounting principles, regardless of whether shortages in treaty funds may also be termed contractual breaches.

▮ Where the Government, acting as a fiduciary, has improperly charged expenses to the Indians when they actually benefited the Government or other third parties, or has failed to expend funds appropriated for the benefit of the Indians in the manner provided for by treaty, these amounts are properly excepted to, and may be recovered by an Indian tribe. *See, e. g., Rogue River Tribe of Indians v. United States*, 105 Ct.Cl. 495, 550, 552, 64 F.Supp. 339, 343–44 (1946); *Seminole Nation v. United States*, 102 Ct.Cl. 565, 629–31, *cert. denied*, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945). However, plaintiff can recover only for improper treaty expenditures to the extent that they exceed any offsets to which defendant is entitled. *See, Rogue River, supra*, 105 Ct.Cl. at 552, 64 F.Supp. at 343–44. *See also*, 25 U.S.C. § 70a. Defendant will therefore have the opportunity to prove that it made sufficient proper expenditures to cancel out any improper charges, and thus that its treaty obligations were fulfilled even though certain expenditures are disallowed. This provision for offsets will prevent the kind of double recovery defendant predicts will occur if supplementary exception 9 is not dismissed.

Defendant's main concern seems to arise from its apprehension that the Indians will somehow receive a double recovery for the challenged disbursements, since various non-accounting claims in other dockets of the Navajo cases [16] also raise issues relating to the 1868 treaty. In order to prevent potential multiple recoveries, defendant asks that we consolidate the claim presented by supplementary exception 9 with docket No. 229 in which plaintiff seeks to recover additional compensation for cessions of land under the 1868 treaty. It is said that this is necessary because the obligations of the treaty were the consideration for plaintiff's land cessions.[17] According to defendant, proper expenditures may be deducted from the fair market value of plaintiff's lands in determining any additional award constituting fair consideration for the ceded lands, but improper expenditures may not be deducted. The Government also asserts that plaintiff is attempting to claim that the now challenged expenditures are not properly to be considered in docket No. 229 (thereby precluding a deduction from the value of the ceded lands) and is also seeking at the same time to obtain a recovery in this docket No. 69 for the alleged failure to fulfill treaty obligations—thus obtaining the effect of a multiple recovery.

We are faced with a situation where there are several separate, but potentially overlapping dockets, all relating generally to claims by the Navajo Tribe against the United States. In these circumstances, defendant might have a legitimate concern about double recovery, except for one significant factor. A single trial judge will hear all of these related dockets, and will be able, where necessary, to take appropriate

---

**16.** This docket is composed of the accounting claims from docket Nos. 69, 299 and 353. These claims were consolidated in *Navajo Tribe v. United States*, 31 Ind.Cl.Comm. 40, 59 (1973), and separated from docket 69's non-accounting claims in *Navajo Tribe v. United States*, 35 Ind.Cl.Comm. 305, 311 (1975). In addition, there is now pending before this court, docket No. 229. Docket No. 69 (claims 1–6, 8), containing the non-accounting claims of the original docket No. 69, was dismissed by the court in *Navajo Tribe, supra*, 220 Ct.Cl. ——, 601 F.2d 536.

**17.** Plaintiff disputes defendant's position that the *sole* consideration for defendant's payments under the 1868 treaty was cession of plaintiff's aboriginal lands. Plaintiff argues that this issue may be decided in its favor, in which case consolidation would not be appropriate, since docket No. 229 deals only with consideration for land cessions under the 1868 treaty, not with fulfillment of 1868 treaty obligations generally, as supplementary exception 9. *See, Saginaw-Chippewa Indian Tribe of Michigan v. United States*, 30 Ind.Cl.Comm. 295, 305–06 (1973).

steps such as setoffs to avoid any double recovery which might otherwise occur. The trial judge is clearly aware of defendant's concern, as evidenced by his opinion now under review, in which he states several times that double recovery will not occur as a result of any possible overlaps in pleadings. We believe that the trial judge will have no difficulty preventing plaintiff from recovering more than once for any improper expenditures. We therefore reject defendant's request for consolidation, at least at this stage of the proceedings, because the expenditures questioned by supplementary exception 9 are properly part of the consolidated accounting claims of this docket No. 69, and because we believe the trial judge will be able to avoid double recovery without the necessity of further complicating this case with additional consolidations.[18] The trial judge is free, however, to order consolidation at a later step in the proceedings if he considers that remedy called for by the status of the litigation at the subsequent time.

In connection with its consolidation argument, defendant now contends, in addition, that the exception relates to the dismissed claims in docket No. 69, rather than to the accounting claim in this docket, which was not dismissed, and therefore that supplementary exception 9 must be dismissed under *Navajo Tribe, supra,* 220 Ct.Cl. ──, 601 F.2d 536. We have considered that problem in Part III of this opinion, *supra,* and hold there that an issue in general accounting claim 7 can and may properly fall within the scope of that accounting claim, as opposed to a non-accounting claim dealing with subject matter similar to that encompassed by the accounting claim. Such is the case here, where supplementary exception 9 is directed specifically at disbursements of tribal funds listed in a GAO accounting report. This report was submitted by defendant in order to comply with plaintiff's request for an accounting under claim 7 and the other accounting claims in the dockets. The exception, as an exception to certain treaty expenditures listed in that accounting report, relates to claim 7, which is an independent and timely filed request for a full equitable accounting of defendant's management of plaintiff's trust property and money. Claim 7 therefore gives this court jurisdiction over matters coming within the scope of the accounting, including this exception. To the extent that there is any overlap of claim 7 and claims 4, 5 and 6, they may be considered alternate pleadings, and voluntary dismissal of some does not require dismissal of the others.[19]

## VII

In the preceding Part VI of this opinion, we denied defendant's request that we dismiss all of supplementary exception 9. In addition to this request for a blanket dismissal, defendant has asked us to review certain segments of that exception questioning some specific expenditures. We are concerned here with an exception to disbursements totalling $1,504,839.57, appropriated for educational purposes.[20] Plain-

---

18. In so deciding, we have considered and rejected defendant's argument that consolidation is proper because the parties have presented substantial evidence in docket No. 229 relating to the propriety of expenditures made to fulfill 1868 treaty obligations. In a complex and inter-related case such as this one, some overlap of factual evidence is inevitable, and is not a sufficient reason to further burden this case with additional changes in form.

19. In *Navajo Tribe v. United States,* 34 Ind.Cl. Comm. 432 (1974), the Indian Claims Commission rejected defendant's argument that a particular exception was not valid because it related to claim 5 of plaintiff's original petition in docket No. 69 (dealing with defendant's actions with regard to plaintiff's resources and tribal

property), which was deleted in plaintiff's amended petition, *id.* at 433. The exception related to the accounting report's failure to provide basic information about various sources of revenue. The Commission found that the exception was not affected by the dismissal of claim 5, because it came within the scope of the general accounting claim (claim 7). *Id.* This analysis is equally valid with regard to defendant's argument concerning dismissal of supplementary exception 9.

20. The seventeen appropriations at issue were made in 1913 through 1928, and basically provided that they were for the purpose of carrying out Article VI of the 1868 treaty. Article VI provides that "[i]n order to insure the civiliza-

tiff excepted to the 1914–1930 expenditures under those appropriations as being too late, poorly conceived and executed, and not for the benefit of the Navajos.

Defendant's motion to dismiss was based primarily on the contention that its obligations under Article VI of the 1868 treaty were limited to a ten year period from 1868 to 1878, and therefore did not extend to the appropriations made in 1913–1928. The trial judge found that the Government's obligations under Article VI were, in fact, limited to the ten years following the 1868 treaty, but declined to dismiss the sub-exception we are now considering (Part CXXIII of trial judge's opinion). He found that plaintiff had a right to know whether any of the funds expended under the 1913–1928 appropriations were applied to non-Navajo beneficiaries in contravention of the appropriation acts, and, even though this was not specifically requested, he construed the exception in that way in order to avoid the need for amendment. We affirm the trial judge's denial of defendant's motion to dismiss this sub-exception.[21]

Under 25 U.S.C. § 70k (1976), claims under the Indian Claims Commission Act had to be submitted before August 13, 1951, or they are barred. Defendant contends that the trial judge's modification of the sub-exception to include a claim under the 1913–1928 appropriations is incorrect because such a claim is barred since it was not timely pleaded under section 70k. In reaching this conclusion, defendant relies on our decision in *Navajo Tribe, supra*, 220 Ct.Cl. ——, 597 F.2d 1367. There, we rejected the Navajo Tribe's attempt to amend its petition in docket No. 229 to state a new land claim relating to the Bosque Redondo reservation because, *inter alia*, neither the original nor the amended petitions referred to

the land at issue, or to the statute or executive order creating the reservation. *Id.* at ——, 597 F.2d at 1370 (1979). The doctrine of relation back could not be used to amend the petition to include the new claim (see Indian Claims Commission Rule 13(c) and Court of Claims Rule 39(c)), and it was barred by the applicable statute of limitations contained in section 70k. *Id.* at ——, 597 F.2d at 1370–71 (1979).

Reliance on that *Navajo Tribe* decision is misplaced, because in that instance there was no nexus between the claims in the original and amended petitions, and the new claim plaintiff attempted to add. Here, however, the questioned exception had a clear relationship to the timely pleaded claim for a general accounting (claim 7), and relation back is proper. *See Menominee Tribe of Indians v. United States*, 102 Ct.Cl. 555, 564 (1945). The seventh claim asks for a true and complete accounting of transactions carried out by defendant, its agents, and employees with regard to plaintiff's property and assets. It specifically alleges that defendant has violated its duties as guardian in that funds appropriated by Congress for plaintiff's use and benefit have come into defendant's possession as a result of the trust relationship, and that defendant has failed to adequately or correctly account "for such * * * disbursals, and disposal of such * * * payments * * *." Thus, the language in claim 7 is more than sufficient to encompass the accounting exception now before us, *see, Navajo Tribe, supra*, 34 Ind.Cl. Comm. at 433, especially in light of the fact that the appropriation figures in question were provided in response to plaintiff's request for an accounting. *See, Blackfeet & Gros Ventre Tribes, supra*, 34 Ind.Cl.Comm.

tion of the Indians entering into this treaty, the necessity of education is admitted * * *, and the United States agrees that [a schoolhouse and teacher shall be provided for every thirty children] * * *. The provisions of this article to continue for not less than ten years."

**21.** In so holding, we do not need to reach (on the Government's appeal) the issue of whether the obligations created by Article VI extend

beyond the ten year period following execution of the treaty, since we agree with the trial judge that plaintiff's sub-exception is proper even in the absence of a treaty obligation to make the 1913–1928 appropriations. However, in Part IX of this opinion, *infra*, we consider the Tribe's appeal from the trial judge's reiteration of his prior ruling that the treaty obligation on education lasted no more than 10 years.

at 141–42 (accounting reports are part of the pleadings which frame the issues for hearing, and are therefore admissions on which plaintiff can rely).

We agree with the trial judge that, once Congress has appropriated money specifically for plaintiff's benefit, as it did in the 1913–1928 appropriations, the plaintiff has "a legitimate right to know whether any of these appropriations were applied to non-Navajo beneficiaries in contravention of the appropriation acts," Trial Judge's Opinion at 164, and cases cited *supra*, regarding defendant's fiduciary accounting duties, and we hold that the trial judge acted within his discretion in construing the sub-exception to request such an accounting. We find, accordingly, that this exception is properly within the scope of claim 7.[22]

### VIII

The Tribe's requests for review which we consider involve mainly the extent of the Government's obligation to make tribal funds productive either by depositing them in interest-bearing accounts or by investing them fruitfully. Plaintiff challenges a number of the trial judge's holdings in this area (Parts LXXXVIII, LXXXIX, XC of the trial judge's opinion).

The trial judge is correct that it is the settled law of this court that, to recover interest or damages for non-investment, Indians must show statutory, treaty, or contract authority calling for the payment of interest or for investment of tribal funds. *See Mescalero Apache Tribe, supra*, 207 Ct.Cl. at 385, 518 F.2d at 1319; *Cheyenne-Arapaho Tribes, supra*, 206 Ct.Cl. 340, 512 F.2d 1390; *Gila River Pima-Maricopa Indian Community, supra*, 218 Ct.Cl. at ——, 586 F.2d at 216–17 (1978). The problem here is

the existence or not of such authority for various funds, deposits, and accounts.

A. Plaintiff argues strongly that funds required by law to be deposited in IMPL accounts at 4% interest were wrongfully deposited and held by defendant in other, non-interest bearing accounts (e. g. "IIM", or "IMPL, Agency" accounts). It is also said that certain other tribal funds (not required to be deposited in interest-paying IMPL accounts) were improperly (*i. e.* contrary to law) placed in commercial accounts or totally non-productive deposits, or the interest was paid to the Government (not for the benefit of the Navajos).

The trial judge does not directly address these points and we cannot say that the contentions are frivolous or insubstantial on their face (or as argued to us). But at the same time we are not in a position to resolve these issues, several of which embody factual components. We think therefore that they should be investigated further and plaintiff should be permitted to show, if it can, that such deposits of tribal funds in non-interest bearing or non-fruitful accounts were wrongfully made. To that end we vacate the trial judge's dismissal of supplementary exception 5a (and Part LXXXVIII of his opinion) and remand for further proceedings on that exception.

B. The Navajos' separate point that, in the period before July 1, 1930, the Government had a duty to invest plaintiff's funds in trust has already been rejected (*sub silentio*) in large part in *Mescalero Apache Tribe, supra*, 207 Ct.Cl. 369, 518 F.2d 1309. The 1883 and 1887 statutes on which plaintiff now relies were before the *Mescalero* court but were not accepted as imposing such a duty to invest or make productive.[23] *Id.* The trial judge did not err in following *Mescalero* in this respect.[24]

---

**22.** Defendant repeats, in challenging this sub-exception, several of the same contentions we have rejected (in Part VI of this opinion, *supra* ) in connection with the main exception. Our discussion in Part VI applies to this sub-exception as well.

**23.** The writer of this opinion, dissenting in *Mescalero*, discussed these statutes at some length, and thought them applicable, but the majority of the court did not agree.

**24.** On the other hand, it may very well be that the *Mescalero* court did not consider section 28 of the Act of May 25, 1918, ch. 86, 40 Stat. 561, 591, or the Act of June 24, 1938, ch. 648, 52 Stat. 1037. On remand, the parties and the trial judge may appraise the impact of those pieces of legislation. To that extent Part LXXXIX of the trial judge's opinion is vacated.

C. The third of the Tribe's "interest" points is that it was entitled, in the period after July 1, 1930, to have the interest earned on its tribal funds placed in interest-bearing accounts or otherwise invested productively. *Mescalero* held that compound interest is not allowable in the absence of statutory permission (which does not exist in this instance) and, on the authority of that decision, we must reject the claim that interest earned on tribal funds should have been deposited, when earned, in interest-bearing accounts. *Id.* at 404, 518 F.2d at 1331.

As for a separate obligation to invest tribal funds productively—whether those funds be earned interest or other tribal funds—the matter is not at all clear at this stage, and does not seem to have been sufficiently canvassed at the trial level. The presentation, based on Congressional enactments, made to us on this point by plaintiff and by the brief amicus curiae is substantial. We think, again, that the problem deserves further consideration, and we remand the issue to the trial judge so that he can reconsider it in the light, not only of *Mescalero*, but also of *Cheyenne-Arapaho* (which was not overruled by *Mescalero, see Mitchell v. United States*, 219 Ct.Cl. ——, ——, 591 F.2d 1300, 1306 n. 21 (1979), *rev'd on other grounds*, —— U.S. ——, 100 S.Ct. 1349, 64 L.Ed.2d 607 (1980), and the pertinent legislation which was not rejected in *Mescalero (see supra)*—as well as the relevant facts to be proved. To facilitate this reconsideration, we vacate Parts LXXXIX and XC of the trial judge's opinion to the extent they prevent such reconsideration from taking place.

## IX

The trial judge repeated, in passing, his prior holding that the Government's obligation under the 1868 treaty to provide education for the Navajos lasted for no more than 10 years. The Tribe seeks review of this ruling, and though it is not necessary to consider it in order to deal with the particular supplementary exceptions now before us (*see* Part VII of this opinion, *supra*), we do so because the holding is a dispositive one and may play a significant role in determining the full extent of defendant's fiduciary obligations under the 1868 treaty.

Article VI of the treaty provided as follows:

ARTICLE VI. In order to insure the civilization of the Indians entering into this treaty, the necessity of education is admitted, especially of such of them as may be settled on said agricultural parts of this reservation, and they therefore pledge themselves to compel their children, male and female, between the ages of six and sixteen years, to attend school; and it is hereby made the duty of the agent for said Indians to see that this stipulation is strictly complied with; and the United States agrees that, for every thirty children between said ages who can be induced or compelled to attend school, a house shall be provided, and a teacher competent to teach the elementary branches of an English education shall be furnished, who will reside among said Indians, and faithfully discharge his or her duties as a teacher.

The provisions of this article to continue for not less than ten years.

We agree with the trial judge that, in the absence of very strong materials suggesting the contrary, the second paragraph must be taken literally to mean that the defendant's obligations under the Article were not to continue for more than 10 years. In fact, Congress made ten consecutive payments for Navajo education, beginning in 1871 and ending 1880. The tenth appropriation expressly said: "*For last of ten installments, for pay of two teachers per sixth Article of treaty of June first, eighteen hundred and sixty-eight, two thousand dollars * * *.*" Act of May 11, 1880, ch. 85, 21 Stat. 114, 121 (emphasis added). There were no further appropriations for Navajo education until 1913.

The Navajos rest on these later appropriations for 1913–1928 (discussed *supra* in Part VII of this opinion, on the defendant's appeal) which stated that they were for the purpose of carrying out Article VI of the 1868 treaty. But the impact of such later Congressional expressions depends on their nearness, sharpness, and relevance to the statute or treaty being interpreted. *See, e. g. Securities and Exchange Commission v. Capital Gains Research Bureau*, 375 U.S. 180, 199–200, 84 S.Ct. 275, 287, 11 L.Ed.2d 237 (1963); *Waterman S. S. Corp. v. United States*, 381 U.S. 252, 268–69, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1965). There was a gap of 23 years between the 1880 appropriation act declaring that it was the last of ten installments and the 1913 appropriation; in addition, the 1913 appropriation came some 45 years after the treaty. Nor are we cited to legislative history of the 1913–1928 statutes spelling out clearly that Article VI was intended to last indefinitely or until the educational goal was fully achieved.[25] As shown in Part VII, *supra*, these later appropriations can stand as educational appropriations to the Navajos even if one disregards the mention or scope of the 1868 treaty. In these circumstances, we do not consider the citation of the treaty in these later acts as overcoming the plain words of Article VI itself.

Plaintiff asks that, if we do not reverse the trial judge outright, we at least remand this issue for trial. But nothing at all specific has been proffered to us, either in the briefs or at the oral argument, suggesting that a trial will uncover or reveal materials helpful in the interpretation of the meaning of the second paragraph of Article VI. A trial is not warranted simply because a party says, conclusorily and summarily, that it has evidence (entirely unspecified) showing that the parties to the 1868 treaty did not intend the second paragraph of Article VI to mean what it says in words.

## X

The remaining dispositive issues presented by plaintiff[26] may be considered concisely. The Tribe's challenge to the return to the Treasury of surplus, unexpended treaty appropriations should not have been rejected, as it was, without giving the plaintiff a chance to prove that the United States had failed to comply with its treaty obligations (Part CIII of the trial judge's opinion). That disposition is reversed. Also, the total dismissal on legal grounds of supplementary exception 7 (relating to return to the Treasury of portions of funds appropriated to fulfill treaties) in the same Part CIII of the trial judge's opinion is vacated insofar as that ruling relates to the appropriation for the removal of the Indians from the Bosque Redondo reservation (Art. 12 of the 1868 treaty); the trial judge will reconsider the issue as it relates to that particular appropriation, particularly in the light of other portions of his opinion dealing with the appropriation for the removal from Bosque Redondo. The segments of the trial judge's opinion (to the extent unfavorable to plaintiff) dealing with the issue of whether treaty payments were for the benefit of individuals or of the Tribe are affirmed as acceptable. *See* Parts CXI, CXIV, CXXI, CXXXI, CXXXIII of the trial judge's opinion. The *sua sponte* striking by the trial judge of the request for an accounting of "removal expenses" (Parts CXXVI and CXXVII of the trial judge's opinion) is vacated and the issue is to be reconsidered on the basis of the full information available.

**25.** Plaintiff cites *Indian Appropriation Bill, Hearing before a Subcommittee of the House Committee on Indian Affairs*, 63rd Cong., 2d Sess. 327–31 (1913), but that discussion shows no more than that the Interior Department believed at that time that (1) the Government had "moral obligations" to provide adequate school facilities for Navajo Indian children, and/or (2) the Government had not provided adequate ed-

ucational help under the treaty during the ten years the treaty obligation lasted, and further appropriations were needed in 1913 to meet that unfulfilled 10-year obligation.

**26.** We include in this category those dispositive items, or other significant questions (even if not dispositive), which we consider worthy of appellate treatment by us at this time.

Finally, we think that the trial judge should reconsider, in the light of *Navajo Tribe, supra,* 218 Ct.Cl. at ——, 586 F.2d at 204–05 (1978), the chronological presumption he established with respect to post-1946 "continuing wrong" claims. For that purpose we vacate Part LXXVII of his opinion.

## CONCLUSION

The case is remanded to the trial judge for further proceedings consistent with this opinion.